**Appeal of J.L.C. (Father).**

Superior Court of Pennsylvania.

Submitted Aug. 11, 2003.
Filed Dec. 2, 2003.

Henry S. Hilles, III, Norristown, for appellant.

Craig B. Bluestein, Public Defender, Norristown, for appellees.

Karen A. Coletta, Norristown, for Office of Children and Youth Services, participating party.

BEFORE: STEVENS, KLEIN, and GRACI, JJ.

OPINION BY KLEIN, J.:

¶ 1 J.L.C. ("Father") appeals from two orders entered February 18, 2003, in the Court of Common Pleas of Montgomery County, Orphans' Court Division, involuntarily terminating his parental rights with respect to his sons, J.R.C. and J.L.C. We affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

¶ 2 Father and S.A.R. ("Mother") are the natural parents of two sons, J.R.C., born on October 27, 1997, and J.L.C., born on February 11, 1999. The record reveals that in September 2000, Mother placed J.L.C. and J.R.C. in the care of Richard and Mary Vogenitz, who attended the same church as the boys' maternal grandmother. At the time, Father was incarcerated and Mother was unable to maintain suitable housing for herself and the children. Father was released from prison in January 2001. On March 26, 2001, Mother and Father signed a voluntary placement agreement, effective for thirty days, permitting Mr. and Mrs. Vogenitz to retain physical custody of their sons while they attempted to obtain employment and rectify their housing situation. Mother and Father were unable to achieve these goals, however, and on May 2, 2001, Mr. and Mrs. Vogenitz were approved by the Department of Public Welfare as foster parents of J.R.C. and J.L.C.

¶ 3 Mother continued to be unsuccessful in securing steady employment or a permanent residence. Father was unable to refrain from criminal activity and was reincarcerated from June through November 2001, and again from early April through October 3, 2002. At a master's hearing on June 3, 2002, the goal for the family was formally changed from reunification to adoption by the foster parents. On October 30, 2002, the Montgomery County Office of Children and Youth ("OCY") filed a petition to involuntarily terminate Mother's and Father's parental rights with respect to J.R.C. and J.L.C. The orphans' court conducted hearings on December 12, 2002, February 14, 2003, and February 18, 2003. At the conclusion of the hearings the orphans' court granted OCY's petition. Father now appeals from that decision.[1]

¶ 4 Father raises the following issue on appeal: whether the orphans' court erred in finding that OCY "had established by clear and convincing evidence that the statutory requirements for involuntary termination of parental rights were met where [Father], while incarcerated, had maintained contact with the children through visits and gifts and, following his release from prison, had demonstrated an increased desire and capacity to provide the essential parental care necessary for the children's physical and mental well-being[?]" Brief for Appellant, at 5.

## II. DISCUSSION

■ ¶ 5 Were the facts found by the trial judge to be those stated in Father's brief, the result might be different. However, we find that the record well supports the conclusion of an able and experienced trial judge that termination of parental rights is in the best interests of the children. As the trial judge, Judge Calvin S. Drayer, Jr., aptly put it:

A parental duty has been defined as an affirmative duty—that is a duty that requires something. It is not a passive duty. It is an affirmative duty on the part of the parent to love, protect and support a child and to make a genuine effort to maintain communication and association with the child. It requires a parent to preserve and make a reasonable effort to maintain a place of importance in the child's life.

(Trial Court Opinion, 5/13/03, p. 2.)

¶ 6 It is clear from the limited involvement Father had with the children that he did not bond with the children *in the way a parent should bond with his or her children.* It is not enough that "both boys know their father," "enjoy being with him," and "love their dad." N.T., 2/18/03, at 207–208, 212. That is not bonding. Being "Uncle Daddy" is not enough. Being a parent means assuming responsibility so that a real bond develops, not just having a casual relationship with one's children. Children often know, love, and sometimes have an enjoyable time with parents who have little to do with their upbringing, and even with parents who physically and mentally abuse them. The key is whether a bond has developed. It is not enough that Father pledges to do more in the future. Once the Father has abandoned parental control through his own actions, it is not enough for him to "promise" to do better to *regain* parental control in the future. Judge Drayer found, based on evidence in the record, that the parental bond has been formed with the foster and proposed adoptive parents, with whom the children have resided for more than half of their young lives.

---

1. Mother raised no objection to the termination of her parental rights and is not a party to this appeal.

¶ 7 Judge Drayer noted in making the determination that "the Court must consider the barriers to exercise in his or her parental rights, which the parent faced in deciding whether that parent had abandoned the child. To obtain the benefit of an excuse, the parent must exhibit reasonable firmness in attempting to overcome the barriers or obstructive behavior of others." Trial Court Opinion, p. 3. Judge Drayer also recognized the fact that the relationship between children who are in foster care will be different than if the children had remained at home.

■ ¶ 8 Here, the Father spent a majority of his time in jail during the six months prior to the filing of the petition. Certainly, the mere fact that a parent is in jail is not grounds to terminate parental rights. However, the mere fact that a parent is in jail does not mean that he can forego trying to maintain a bond with his children.

¶ 9 Judge Drayer said it well:

Incarceration does not obviate parent's duty to exercise reasonable firmness in maintaining a secure bond with child. *In Interest of A.P.*, 692 A.2d 240 (Pa.Super.1997). An incarcerated parent is expected to utilize whatever resources are available to him while in prison in order to foster a continuing close relationship with his children. *In re V.E.*, [417 Pa.Super. 68,] 611 A.2d 1267 (1992).

Here, Father did not attempt to maintain a connection with the children during his incarceration. Father testified about what he wanted to do in the future, but acknowledged he had not fulfilled his parental responsibilities in the past. He did not inquire about the daily lives of the children. He never asked about their report cards. He only sent one card to the children during the period in question. He claims he asked for pictures of the children, and despite his claims that he never received the pic-

tures, he never followed up on the issue. He claims he made calls from prison, but never left a message for his children. He never recorded his voice for the children to hear.

When we measure the conduct of this parent against one in similar circumstances, we find his conduct is well below what would be expected. A parent should always maintain a place of importance in a child's life, even where there are obstacles in the way.

The evidence, in light of the totality of the circumstances, clearly warrants termination of parental rights under Section 2511(a)(1). These children are young. The early years are critical to the development, self-esteem, confidence, perception of place in the world, and the security that the family provides. The Court finds that Father has failed and refused to perform the parental duties required in the 6 months preceding the filing of the petition.

(Trial Court Opinion, 5/13/03, at 3–4; *see also* N.T., 2/18/03, at 290–93.)

¶ 10 We note that Judge Drayer's conclusion is supported in the brief of Craig B. Bluestein, Esquire, Guardian *ad litem* for the children:

The Court must also consider and give primary consideration to the developmental, physical and emotional needs and welfare of the children. 23 Pa. C.S.A. § 2511(b). There did exist competent evidence on the record that the children are happy, healthy and safe in their current environment and that it would serve their needs and welfare to remain there. Adoptive mother testified that the children fit in well in their home. They interact with the biological children of the adoptive parents just like siblings. The boys are bonded with the adoptive parents, having been there now for more than one half of their young

lives. Both are doing well in school. (N.T. 2/18/03, 201–2). The foster/adoptive parents wash their clothes, feed them, bathe them, supervise them, read them books, do puzzles with them, discipline them, and love them actively through words and deeds. The Appellant does none of that. At the same time, there is little bond between the biological parents and the boys. During 2002, they never specifically asked the foster/adoptive parents about their biological parents (N.T. 2/14/03, 214). Further, only four visits occurred the entire year of 2002. (N.T. 2/14/03, 218–9). The children are well settled, psychologically bonded with the foster/adoptive parents, rely upon them, and are loved by them in ways that the Appellant has never demonstrated. They have earned the right to adopt them and the children deserve the love and permanence of the house in which they live. The children have long since learned to call this place more than just a house. The children call it their family and their home. It is respectfully requested that this Honorable Court follow the lead of the children, and call it their home permanently.

¶ 11 It is true that in reviewing a ruling involuntarily terminating parental rights, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so. The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.

¶ 12 In reviewing an order involving termination of parental rights, our scope of review is broad, and all the evidence as well as the hearing court's factual and legal determinations will be considered.

¶ 13 However, the standard of review is limited to determining whether the decree of the lower court is supported by competent evidence and whether it gave adequate consideration to the effect of such a decree on the welfare of the child. *In re Adoption of S.M.*, 816 A.2d 1117, 1122 (Pa.Super.2003) (citations omitted). "Unless the Orphans' Court abused its discretion or committed an error of law, its findings are entitled to the same weight given a jury verdict." *In re P.A.B.*, 391 Pa.Super. 79, 570 A.2d 522, 524 (1990), *appeal dismissed as improvidently granted*, 530 Pa. 201, 607 A.2d 1074 (1992). Above all else in determining whether parental rights should be terminated, adequate consideration must be given to the needs and welfare of the children involved. *In re Child M.*, 452 Pa.Super. 230, 681 A.2d 793 (1996), *appeal denied*, 546 Pa. 674, 686 A.2d 1307 (1996).

¶ 14 As noted, Judge Drayer did exactly that. He gave full consideration to the best interests of the children, and his findings show that there was clear and convincing evidence that Father did not come close to doing what he should have done to bond with his children, even considering his incarceration. The record fully supports his findings.

¶ 15 In the case before us, OCY petitioned for termination of Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (8). The applicable provisions of the Adoption Act, for which OCY was required to offer clear and convincing evidence, are as follows:

(a) **General rule.**—The rights of a parent in regard to a child may be

terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

. . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . .

23 Pa.C.S.A. § 2511.

¶ 16 At the evidentiary hearings, OCY offered the testimony of caseworkers Lorraine Keys and Alison Lane, foster mother Mary Vogenitz, and several law enforcement officials who were familiar with Father's criminal offenses. Father attended the proceedings and testified on his own behalf. We have carefully reviewed the notes of testimony and will now set forth a summary of the evidence presented.

¶ 17 Keys was assigned to the case from the beginning of OCY's involvement in November 2000 until June 1, 2001. At her initial meeting with Father and Mother on March 26, 2001, Keys advised the parents to visit the children frequently, take photographs of the visits, and make taped recordings of their voices to give to the children. N.T., 12/12/02, at 27–28. Specific objectives for Father were to provide a safe environment for the children, main-

tain recovery from drug and alcohol dependency, and be able to pay bills and maintain an apartment. *Id.* at 36–37. Keys testified that, to the best of her knowledge, Father failed to accomplish any of these goals during the seven months she was assigned to the case. *Id.* at 28. Keys was unaware of any phone calls from Father to the children, *Id.* at 40, however she did recall one visit between March 21 and June 1, 2001. *Id.* at 59.

¶ 18 Alison Lane, the current OCY caseworker assigned to this case, replaced Keys on July 18, 2001. N.T., 2/14/03, at 125. Lane testified generally about the family service plans instituted by OCY in this case. Father's primary goal was to maintain a relationship with his sons through regular visits, written correspondence and telephone calls. *Id.* at 59–83. In addition, Father was expected to achieve and maintain recovery from his substance abuse problem, attend anger management classes, refrain from criminal activity and, when released from prison, obtain employment and housing. *Id.*

¶ 19 With respect to OCY-supervised visits, Lane testified that Father met with the children on March 3, June 17, September 26, October 10, December 19, and December 30, 2001, and on January 22, February 3, October 23, and November 6, 2002. *Id.* at 125–27, 166. Lane added that there could have been visits arranged by Mother of which she was not aware. *Id.* at 131. When asked to focus on the time period from January 1, 2002 to November 15, 2002, Lane testified that, to the best of her knowledge, Father sent one card to his sons, did not request photographs, did not inquire as to the boys' preschool activities or their daily routine with the Vogenitz family, failed to send money, clothing or birthday gifts to them, and did not make recordings of his voice for the children or request recordings of their voices. *Id.* at

153–60. Lane testified that Father attended an anger management program but in her estimation had made no significant progress in that area. *Id.* Lane recalled speaking with Father at a meeting on September 19, 2002, regarding his desire to regain custody of his children once he was released from prison. *Id.* at 39. Lane reminded Father that he would need to secure employment and appropriate housing. *Id.* at 40. Father suggested to Lane that he still had a drug problem. *Id.* at 41.[2] Father also admitted that he had not called the foster home or attempted to contact the children by writing letters or sending cards. *Id.* at 42. Lane also testified that Father took no legal action after the master suspended prison visitations and changed the goal to adoption on June 3, 2002. *Id.* at 53–54.

¶ 20 The tenor of Lane's testimony is that, in her opinion, Father failed to achieve any of the goals set for him by OCY. The following excerpt from Lane's direct examination testimony is illustrative of her views:

Q. Ms. Lane, before I wrap up your testimony, how do you feel [Father] cooperated with you in an attempt to regain custody of his children?

A. I feel that [Father] was [sic] stayed off to the side a lot. [Mother] did a lot of the telephone conversations with me, meetings and things like that because he spent a lot of time in jail. [Father] did a lot of talking to me when we would interact with each other about he knows he needs to get away from [Mother], he knows he needs to get his life in order to get his kids back. But as far as actions, I saw minimal actions.

Q. Like what?

A. He would stay out of jail for a little while. He would come to some visits. He was affectionate with the kids and he was appropriate. But I didn't see [Father] taking these great steps to show me that he had jobs and to show me he was maintaining himself in a way that could show the agency he was able to take the kids back.

*Id.* at 91–92.

¶ 21 Lane has had close contact with the foster parents and testified regarding their relationship with the children. Lane stressed that the boys have their own bedroom and that the Vogenitz home is a clean and safe environment. *Id.* at 162. Lane observed that the children are close to their foster parents and exhibit a strong and trusting connection with them. *Id.* at 163. Lane opined that the children are "making great progress in this house, developing like normal little boys," and that their interests would best be served by remaining there permanently. *Id.* at 163–64.

¶ 22 Mary Vogenitz testified that, with the exception of three or four days in December 2000, J.L.C. and J.R.C. have resided with her family since September 2000. N.T., 2/18/03, at 182. Vogenitz recalled one occasion between September, 2000, and March, 2001, when Father and Mother visited the children at her home, bought them clothing, and gave $100 to Vogenitz. *Id.* at 185. Vogenitz expressed her concerns to OCY regarding the limited

---

**2.** Michael Agatone, supervisor of the Montgomery County Juvenile Probation Department's drug and alcohol testing program, testified that urine samples were obtained from Father on November 20, 2002, December 4, 2002, and January 22, 2003. The first two samples tested positive for marijuana. The third, most recent test was negative. N.T., 2/14/03, at 44–45. We note that all three tests were conducted after Father received notice of OCY's petition, *see* fn. 3, *infra.*

and inconsistent visits and the general lack of interest both parents exhibited toward their sons. *Id.* at 192. Vogenitz recalled visits with Father on November 1, November 31, December 9, and December 30, 2001 and on January 22, February 3, October 23, and November 6, 2002. *Id.* at 193–95, 216–217. Vogenitz stated that Father did not call the children and sent them one letter, in October 2001. *Id.* at 196. She was present when Lane advised Father to make a tape recording of his voice, which he never did. *Id.* at 197. After OCY began supervising the visits in March, 2002, Vogenitz recalled taking the children to visit Father in jail on two occasions. *Id.* at 198. Vogenitz testified that following Father's most recent release from prison on October 3, 2002, he did not contact her immediately but did telephone J.R.C. on his birthday, October 27. *Id.* at 199. She remembered Father calling the children on Christmas Day, 2002. *Id.* at 200.

¶ 23 Vogenitz stated that her two foster sons have adapted to their new environment and are "happy and healthy." *Id.* at 201. According to Vogenitz, they are affectionate with her and her husband and call her "Mommy Mary." *Id.* Vogenitz noted that the boys are doing very well in preschool and that Father has never inquired about this aspect of their lives. *Id.* at 202. When questioned about notations describing six visits between September 26, 2001 and February 3, 2002, Vogenitz acknowledged that Father interacted well with the boys, was very affectionate toward them, acknowledged their feelings, exhibited patience, and appropriately redirected any misbehavior. *Id.* at 203–207. Vogenitz recalled that Father gave a handmade crucifix necklace to each of the boys during the prison visits in late 2001. *Id.* at 204. Vogenitz testified that neither of the children specifically asked for Father during 2002, *id.* at 214, however she agreed that Father is "good with [J.L.C. and J.R.C.]," that "both boys know their father," "enjoy being with him," and "love their dad." *Id.* at 207–208, 212.

¶ 24 Father's testimony reveals a clear awareness of his past shortcomings. Although he claims to be working toward securing a permanent residence, Father admitted that he is still not in the best position to be a father. *Id.* at 246.

¶ 25 While Father spent a good deal of time stating what he planned to do *in the future*, his *actions* to date carry more weight than his *promises* for the future. Although he testified that he took anger management and Narcotics Anonymous courses and that his mother, age 56, is willing to assist him with parenting should he regain custody of J.L.C. and J.R.C. (*Id.* at 236), that is no substitute for his past behavior.

¶ 26 Judge Drayer carefully considered the whole record and reached the conclusion that Father did not do what would be expected of a reasonable person in his situation to maintain a bond with his children. Rather, such a bond was made with the adoptive parents. It is appropriate to rely on past behavior rather than future promises. Not only do we find that Judge Drayer did not abuse his discretion, we find his ruling an intelligent, thoughtful decision based on the record.

¶ 27 Orders Affirmed.

¶ 28 GRACI, J., concurs in the result.