J-S53030-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE MATTER OF THE INVOLUNTARY TERMINATION OF PARENTAL RIGHTS TO A.N.J., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: W.M.J.W. | No. 767 WDA 2014 |

Appeal from the Decree entered April 16, 2014,
in the Court of Common Pleas of Venango County, Orphans'
Court, at No(s): O.C.D. No. 204-2013

BEFORE:    DONOHUE, OLSON, and PLATT*, JJ.

MEMORANDUM BY OLSON, J.:                    **FILED OCTOBER 08, 2014**

W.M.J.W. ("Mother"), appeals from the trial court decree entered on April 16, 2014, involuntarily terminating her parental rights to her daughter, A.N.J. ("Child"), born in December of 2010, pursuant to Section 2511(a)(1) and (b) of the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1) and (b).  We affirm.

On November 19, 2013, J.M.J., Child's father, ("Father"), and his wife, J.L.J. ("Stepmother"), filed a petition for the involuntary termination of Mother's parental rights to Child, so that Stepmother may adopt Child.  They filed an amended petition on December 11, 2013.  The trial court held a hearing on the petition on February 24, 2014.  At the hearing, Father, Stepmother, and Mother testified.  Child, who was approximately three years old, was represented by an appointed child advocate, Virginia G. Sharp, Esquire.  Child is currently residing in a home in Venango County with Father

_____

* Retired Senior Judge assigned to Superior Court.

and Stepmother, and their child, K.J., born in February of 2014. Father's

mother, and Father's sister and her husband, as well as their two children,

also reside in the home. Mother is currently housed at the State

Correctional Institution ("SCI") Cambridge, Cambridge Springs,

Pennsylvania, where she is serving a sentence with a maximum date of

February 17, 2019. *See* Trial Court Opinion, 4/9/14, at 1-2.

The trial court found the following facts from Father's testimony:

> Prior to residing at [his current address], [Father] lived for approximately seven months [at a different address in Venango County]. Before residing at [that address], Father resided at [his current address] for approximately two years. He was married to [Stepmother] [in November of 2013]. He has one other child, [K.J.]. . . . When he lived with [] Mother and [Child,] they lived at his mother's home[, his current residence]. [] Mother moved out[,] and [Child] continued to reside with him[,] on either February 14th or 15th of 2011. [] Mother was arrested on a probation violation for a misdemeanor assault a few days after she ceased living with [] Father.
>
> [] Father testified that the last time [] Mother asked him to see [Child] was in January of 2013, during a phone call. He did not take [Child] to see her. She asked to speak with [Child] in January of 2013, and he did permit [Child] to speak with [] Mother. He occasionally received collect phone calls from [] Mother throughout 2013, but he did not accept the collect calls. After [Father] filed the Petition for Involuntary Termination, he received a phone call from [] Mother about two-three weeks afterwards inquiring into why [he] was filing the petition, asking him to send her pictures of [Child], and asking him to take [Child] to visit her. He has received birthday cards and Valentine's Day cards from [] Mother for [Child] since 2011[,] which he read to [Child]. However[,] from January 2013, through the filing of the Petition in November of 2013, [] Father received no cards, no gifts, but perhaps one letter from [] Mother for [Child]. [] Mother does not pay child support. During her incarceration[,] [] Mother has had [] Father's phone number, and his address at [his current address]. [] Mother did not have

- 2 -

Father's address when he moved to [his prior address], but he informed her of it when he spoke with her on the phone in January of 2013. [] Father stopped responding to [Mother's] letters sometime prior to marrying his wife. He believes that the last time [Mother] inquired about [Child] was March of 2013.

[] Father ended contact with [] Mother's relatives around October to November of 2011, as he felt uncomfortable taking [Child] to their house. He received a request for visitation rights from [] Mother's step-mother in early 2012, but no follow[-]up occurred. He has seen Mother's relatives occasionally at the playground or grocery store. [] Mother's relatives have not offered to provide monetary support and do not send cards or gifts to [Child].

[] Father provides for the [Child's] religious needs by sending her to church with his mother. He sees to her educational needs, and she is to start Head Start within the next couple of months, and she is developmentally on track. Father is employed by Liberty Electronics, where he has worked for the past three and a half years. He and his wife, [Stepmother], take [Child] to her doctor's appointments with Dr. Bishop[,] and her immunizations are up to date. [Child] has no health issues[,] and [] Father's health is also good. [Child] refers to [Stepmother] as mom.

Trial Court Opinion, 4/9/14, at 2-3.

The trial court found the following facts from Stepmother's testimony:

[Stepmother] is not employed. She married [] Father [in November of 2013], and has a child with him, [K.J.]. . . . She has helped care for [Child] since January [of] 2013, until present. She cares for [Child] and plays with her while [] Father is at work. [Child] calls her mom. A typical day for [Child] looks like: waking [Child] up between 7-8 a.m., breakfast, a movie, then playing with toys, lunch at noon, a nap, playing in the afternoon, eat dinner at 5[.] [Child] plays with [] Father after dinner[,] then they watch a movie before putting her to bed. [Stepmother] prepares the meals for their family. [Stepmother] testified that [Child], "feels like she's mine." She wishes to adopt [Child].

Trial Court Opinion, 4/9/14, at 3-4.

The trial court found the following facts from Mother's testimony:

[] Mother, as of one year prior to the birth of [Child], was unmarried[,] and she remains unmarried. Initially, [Child] resided with both [Mother and Father]. On or about February 14, 2011, [Mother and Father] separated[,] and [Child] was left in the care of her [Father]. [] Mother became incarcerated a few days later[,] on February 17th, 2011. She was incarcerated at the Venango County Jail for about seven months before she received a state sentence. While she was at the Venango County Jail[,] she visited weekly with [Child] when [] Father would bring [Child] to the jail. The last time [] Mother visited with [Child] was in September of 2011[,] before she was transported to SCI Muncy. After being transported to SCI Muncy, [] Mother wrote letters to [] Father and occasionally made phone calls. She estimates that she wrote a letter to [] Father about once or twice a month while at SCI Muncy[,] and spoke to [Child] on the phone once or twice. [] Mother was next transferred to SCI Cambridge[,] where the letters and phone calls initially continued. [] Mother and [] Father would talk about how [Child] was doing and her daycare. [] Mother asked [] Father to send pictures of [Child] or to bring [Child] to visit her, but he told her that he would not because he did not want her to be at a prison. [] Mother never filed any custody action to compel visitation with [Child] at SCI Cambridge. In 2012, Mother stopped receiving correspondence from Father. [] Mother would call [] Father collect from the prison[,] and he no longer accepted [] Mother's calls. She spoke with [Child] once in March of 2013, on the phone and then once in December[,] after Father filed his Petition for Involuntary Termination. Mother stated that she and [Child] talked about colors, Dora the Explorer, My Little Pony, sang the A, B, C's, and that she told [Child], "mommy loves you." [] Mother was aware that [] Father was not taking [Child] to see her maternal extended family.

While incarcerated[,] [] Mother obtained her G.E.D. ["General Educational Development" degree] in May 2012, completed a ten[-]week parenting class, and completed an anger management/violence prevention course. The parenting class began in October of 2013 and was completed December 31, 2013. She has also completed a money smart budgeting course. She believes that she will likely be released on parole in June of this year. Her plan is to reside with her mother. Upon her

release, she would like to enroll in Vo[-]tech to take a course in Cosmetology and become a beautician. If Mother does not receive parole, her maximum date is February 17, 2019.

[] Mother contends that she has tried to maintain a relationship with [Child] while [she has been] incarcerated. She wrote letters to [Child] with [Child's] name addressed on the envelope. She mailed [Child] several cards. She sent a Christmas present for [Child] to her mother's house through the Angel Tree program. She applied[,] through Reverend Johnson[,] in July of 2013, for her three children to be a part of the Angel Tree Prison Fellowship Program before [] Father filed the Involuntary Termination Petition. *See* Respondent's Ex. A. [] Mother said she had the present sent to her mother's address as she was not sure what was going on with [] Father, although she admitted that she knew his phone number and his mother's address. She did not ask [] Father if he gave [Child] the letters she wrote. She said she wrote only eight letters to [Child] while she has been incarcerated because [Child] is so young she wouldn't really understand them. [] Mother estimates that she spoke with [Child] on the phone approximately four times. She claims that every time she wrote her mother she inquired about [Child]. [] Mother admits that she has provided no monetary support for [Child]. She states that he[r] job in the prison does not pay well. [] Mother has not performed any parental duties for [Child] since her incarceration in the Venango County Jail in February of 2011.

[] Mother has two other children who she speaks to [sic] semi-regularly on the phone when the girls are at her mother's home. She said they know that they have a sister [] [Child] although they do not have a relationship with her. She talks on the phone to her mother and the girls every couple of months when her mother puts money on her phone [account].

[] Mother reported that she talked to a parenting worker in October of 2013, to learn how she might be able to compel visitation with [Child]. [] Mother does have a custody order regarding her other two children which was obtained through a PFA proceeding. The custody order permits the girls to visit with their grandmother, but the girls are not to be brought to the prison to visit with [] Mother.

[] Mother has been informed about the option of entering into a voluntary Act 101 post-adoption agreement with [] Father and his wife. [] Mother is opposed[,] as she remembers that her biological mom did not fight for her and her brother, but just gave them up. [] Mother wants [Child] to know that her mother cared enough to fight for her, she loves [Child] and wants better for her. She feels strongly that [Child] is her daughter[,] and that she carried her for nine months as she grew and gave birth to her and[,] thus, "that's my baby." [] Mother will not voluntarily relinquish her parental rights to any of her children.

Trial Court Opinion, 4/9/14, at 4-6.

The trial court found the following facts from the testimony of Mother's stepmother, T.B., who lives in Franklin, Pennsylvania:

[T.B.] testified that she talks to [Mother] every other weekend when she has custody of [Mother's] other two children. She has no visitation with [Child] although she is in the process of working with Mr. McIntyre[fn] to hopefully set up arrangements. She stated that she sent Father a letter when she was setting up visitation with [Mother's] two other children, seeking visitation but visitation was not set up at that time. She received a Custody Order in 2013 that allows her to have time with [Mother's] two older children so that they will get to know [Mother's] side of the family. [T.B.] did not have the money to file a custody action against [] Father and is waiting to save the money for that action. She does not communicate with [] Father. She states that she does not have a phone number for [] Father. She has the Angel Tree Christmas Present from [Mother] for [Child]. She did not deliver the present. The tag says, "mommy loves you, and hopefully, I'll be home soon." [Mother's] two other children opened their Angel Tree presents at Christmastime at her home.

_____

[fn] The identity of Mr. McIntyre in relation to this case is unclear from the record. **See** N.T., 2/24/14, at 73-74.

Trial Court Opinion, 4/9/14, at 7 (footnote added).

The trial court stated the following with regard the recommendation of the child advocate, Attorney Sharp:

> [The child advocate] met with [Child] on January 21, 2014. Due to [Child's] young age, she did not specifically ask her what she wanted in regards to the termination. She identifies [Father] as daddy, but does not recognize [Mother] as her mommy. She talked about her paternal grandparents, and her baby brother that is coming. She did not talk about her older half-siblings. Based on the testimony, evidence, and statutory requirements, Attorney Sharp believes it is in the best interest and welfare of [Child] for the petition to be granted. Attorney Sharp would encourage Mother to put information about herself on file for [Child] to be able to obtain when she reaches the age of majority.

Trial Court Opinion, 4/9/14, at 7; N.T., 2/24/14, at 81-82.

On April 16, 2014, the trial court entered the decree terminating Mother's parental rights, dated April 9, 2014. On May 7, 2014, Mother filed a notice of appeal, but failed to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On May 13, 2014, the trial court entered an order directing Mother to file a concise statement within five days after entry of the order. Mother complied, filing her concise statement on May 19, 2014.[1] *See In re K.T.E.L.*, 983 A.2d 745, 747 (Pa. Super. 2009) (stating that, failure to file a concise statement along with the notice of appeal in a children's fast track matter will result in a defective notice of appeal, to be decided of a case-by-case basis); *cf. In re J.P. v. S.P.*, 991 A.2d 904, 907-908 (Pa. Super. 2010) (stating that failure to file a

---

[1] We note that May 18, 2014 was a Sunday, thus, Mother had until Monday, May 19, 2014 to timely comply. *See* 1 Pa.C.S.A. § 1908.

concise statement along with a notice of appeal in a children's fast track matter, and failure to comply with a subsequent order of the trial court to file the concise statement, will result in waiver of the issues on appeal).

On appeal, Mother raises the following issues for our review:

Whether the trial court erred as a matter of law or abused its discretion in determining that [Mother's] parental rights should be terminated as being in the best interest of the minor child was against the weight of the evidence presented because the evidence presented at trial showed that the natural mother did not demonstrate a settled purpose to relinquish her parental rights?

Whether the trial court erred as a matter of law or abused its discretion in determining that [Mother's] parental rights should be terminated when failing to adequately consider the mother's efforts to maintain contact and a relationship with the minor child?

Mother's Brief, at 6.[2]

Mother argues that she did not demonstrate a settled purpose to relinquish her parental rights, and that the trial court's decision was against the weight of the evidence. She contends that the trial court did not take into consideration the relevance of the length of her incarceration, and the remedy that release from incarceration would provide.

Additionally, Mother asserts that the trial court failed to consider her efforts to maintain contact and a relationship with Child. Mother alleges that the trial court did not afford any consideration to Father's actions that

---

[2] Although Mother's issues do not specify subsections (a)(1) and (b) of Section 2511, it is clear from her discussion in her brief that she challenges the termination of her parental rights under those subsections.

created and placed barriers in the path of her parent-child relationship. She requests this Court to reverse the termination of her parental rights.

We review the appeal from the termination of parental rights in accordance with the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, 36 A.3d 567, 572 (Pa. 2011) (plurality opinion). As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

> As [our Supreme Court] discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. [The Supreme Court] observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826-827 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

Moreover, we have explained:

> [t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id. quoting In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003).

This court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of Section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, the trial court terminated Father's parental rights under Section 2511(a)(1), which provides as follows:

> **§ 2511. Grounds for involuntary termination**
>
> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S.A. § 2511.

We have explained this Court's review of the evidence supporting the involuntary termination of a parent's rights pursuant to Section 2511(a)(1) as follows:

> To satisfy the requirements of section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child **or** a refusal or failure to perform parental duties.

> * * *

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (citations omitted).

> [T]o be legally significant, the [post-abandonment] contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish his parental responsibilities bears the burden of proof on this question.

*In re Z.P.*, 994 A.2d 1108, 1119 (Pa. Super. 2010) (emphasis added) (citation omitted); *see also In re Adoption of C.L.G.*, 956 A.2d 999, 1006 (Pa. Super 2008) (*en banc*).

In *In re Adoption of Charles E.D.M.*, 550 Pa. 595, 602, 708 A.2d 88, 91 (1998), our Supreme Court stated that Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental

claim to a child *and* refusal or failure to perform parental duties, as *or* joins the two portions of the statute.

Further, regarding the definition of "parental duties," this Court has stated as follows:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.
>
> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with . . . her physical and emotional needs.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004).

We find no merit to Mother's argument that the trial court failed to consider that Father posed an obstacle to her contact with Child from prison. With regard to Section 2511(a)(1), the trial court found that Mother was

incarcerated a month and a half after Child's birth, and has performed few parental duties since that time. Trial Court Opinion, 5/29/14, at 2. The trial court determined:

> [] Mother has only had one telephone call with [Child] for a period of at least eight months prior to the filing of the Amended Petition on November 19, 2013. She has failed to contact [Child] on her birthday or holidays besides sending a handful of cards for her. In [Child's] approximately three years of life she has received a total of eight letters/cards from [] Mother. Her last in person visit with [Mother] was in August of 2011 when she was only eight months old. [] Mother has also not performed any parental duties since February of 2011. [] Mother has failed to provide support for [Child], including financial support.
>
> * * *
>
> . . . [Father] has proved by clear and convincing evidence that . . . [] Mother [] has refused or failed to perform her parental duties for a period of at least six months as is required by 23 Pa.C.S.A. § 2511(a)(1). [Mother] has not seen [Child] since August of 2011. [Mother] has not had any contact with [] Father regarding [Child] since March of 2013 until after the filing of the Petition for Involuntary Termination of Parental Rights. [Mother] has mailed only eight cards or letters to [Child] throughout her entire life. Although [] Mother did request for a 2013 Christmas present [to] be sent to [Child] through the Angel Tree Ministry, she did not have it sent to the [] Father's address, which she had since January of 2013, nor did she give her step-mother Father's phone number, which has not changed since [] Mother was incarcerated[,] so that step-mother could coordinate delivery of the Christmas present. [] Mother has not used any of her earnings in the jail to call [] Father to speak with [Child]. After talking to the Parenting Advisor at SCI Cambridge, [] Mother did not initiate any custody proceedings to compel visitation with [Child] during her incarceration.

Trial Court Opinion, 4/9/14, at 8-9.

In its Rule 1925(a) opinion, the trial court considered that Mother sent only a total of eight cards or letters for Child between September of 2011 and September of 2013, although she was presented with the opportunity to send eight free letters each month of her incarceration. Trial Court Opinion, 5/29/14, at 3. Further, the trial court considered that Mother took one parenting class while she was incarcerated, and that she spoke with a parental custody worker at the jail, but took no steps after the class and conversation to file a request for visitation with Child. *Id.*

The trial court found that, from August of 2011 to the time of the termination hearing, Mother had no in-person contact with Child, who was only eight months old, and Mother was content to let other people parent Child, never seeking to compel any visitation with her in prison. Trial Court Opinion, 4/9/14, at 9; Trial Court Opinion, 5/29/14, at 4. The trial court properly considered the fact that Mother was incarcerated in 2011, and was hopeful that she would be released on parole in June of 2014. *Id.* at 5. **See In re Adoption of S.P.**, 47 A.3d at 822, 827-828, 830-831 (stating the trial court may consider a parent's incarceration in ruling on a termination petition under Section 2511(a)(1) or (2)). Mother's hope that she would be released on parole in June of 2014, however, was not a certainty. N.T. 2/24/14, at 65. Thus, the trial court considered all of the evidence that Mother asserts related to her inability to maintain contact with Child, and concluded that it was Mother's own actions and inactions, as opposed to any

obstacles placed by Father, that created the situation where Child does not know her.

After our careful review of the trial court's application of the law to the facts of this case, we find no reason to disturb the trial court's conclusions that Mother failed to perform her parental duties with regard to Child, that her explanations for her lack of contact lacked credibility, and that she failed to sustain her burden of proof with regard to the post-abandonment contact. Thus, the trial court's determinations regarding Section 2511(a)(1) are supported by competent, clear and convincing evidence in the record. *See In re Adoption of S.P.*, 47 A.3d at 826-827.

After we determine that the requirements of Section 2511(a) are satisfied, we proceed to review whether the requirements of Section 2511 (b) are satisfied. *See In re Adoption of C.L.G.*, 956 A.2d at 1009. Section 2511(b) provides:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b). This Court has stated that the focus in terminating parental rights under Section 2511(a) is on the parent, but it is on the child pursuant to Section 2511(b). *In re Adoption of C.L.G.*, 956 A.2d at 1008.

In reviewing the evidence in support of termination under Section 2511(b), our Supreme Court recently stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.

*In re K.M.*, 53 A.3d at 791; *see also In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

Here, the trial court found the following:

> [T]here is a minimal bond between [Mother] and [Child]. [Mother] was only physically present for a substantial amount of time for the first two months of [Child's] life. [] Mother then had short weekly visits with [Child] at the Venango County Jail for the next seven months of [Child's] life. Since August of 2011, [Mother] has spoken with [Child] on the phone a total of four times. [] Father's wife has bonded with and has a mother-daughter relationship with [Child]. [Stepmother] has been involved in [Child's] life as a mother figure for the past year of [Child's] life. She treats [Child] as her own. [Child] recognizes [Stepmother] as her mother, and does not understand her relationship to [] Mother. [Stepmother] expressed her desire to adopt [Child] if the [trial court] terminates [Mother's] rights.

Trial Court Opinion, 4/9/14, at 10.

- 16 -

Thus, Mother has never attended to Child since February of 2011, and has been incarcerated since that time, while Father and, for the past year, Stepmother, have been caring for Child. ***See*** Trial Court Opinion, 5/29/14, at 3-4. The trial court stated that Father has been providing solely for Child's physical needs since Mother's incarceration. ***Id.*** at 4. Father has been her primary provider for her emotional needs, with Mother sporadically calling collect or sending cards to inform Child that she loves her. ***Id.*** Additionally, the trial court found that Father has taken care of Child's medical needs, attended doctor's appointments with Child, and has planned for her education with enrollment in Headstart. ***Id.*** We find that there is competent evidence in the record to support the trial court's determination that Child's developmental, physical, and emotional needs and welfare would best be met by involuntarily terminating her parental rights. ***In re Adoption of S.P.***, 47 A.3d at 826-827.

Moreover, this Court has observed that no bond worth preserving is formed between a child and a natural parent where the child has been in the care of another person for most of the child's life, and the resulting bond with the natural parent is attenuated. ***In re K.Z.S.***, 946 A.2d 753, 764 (Pa. Super. 2008). The trial court found that Child does not recognize Mother as her mother, has no knowledge of her half-sisters on her mother's side, and has a very minimal bond with Mother.

- 17 -

As part of its bonding analysis, the trial court appropriately examined Child's relationship with her caregivers, Father and Stepmother, who have cared for her in Mother's absence. *See In re: T.S.M.*, 71 A.3d at 267-268 (stating that existence of a bond attachment of a child to a parent will not necessarily result in the denial of a termination petition, and the court must consider whether the child has a bond with the caregivers). The trial court found that Child is strongly bonded with Stepmother, whom she considers to be her "mom." *See* Trial Court Opinion, 5/29/14, at 3. The trial court also found that Father and Stepmother provide stability, love, financial security, and a healthy environment in which to raise Child. *Id.* Moreover, the trial court found that Child has a relationship with K.J., her half-brother on Father's side. *Id.* at 3-4.

Mother failed to "exhibit [the] bilateral relationship which emanates from the parent['s] willingness to learn appropriate parenting . . . ." *In re K.K.R.S.*, 958 A.2d 529, 534 (Pa. Super. 2008). She did not put herself in a position to assume parenting responsibilities so that she could develop a real bond with Child. *See In re J.L.C.*, 837 A.2d 1247, 1249 (Pa. Super. 2003).

Thus, the trial court properly found that the termination of Mother's parental rights would not destroy an existing, necessary and beneficial relationship with Child. Trial Court Opinion, 5/29/14, at 3.

While Mother claims she loves Child,[3] this Court has held that a parent's love of her child, alone, does not preclude a termination. ***See In re L.M.***, 923 A.2d 505, 512 (Pa. Super. 2007) (stating that a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights). We have stated that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." ***In re Z.P.***, at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." ***In re B., N.M.***, 856 A.2d at 856.

As there is competent evidence in the record that supports the trial court's credibility and weight assessments regarding Child's needs and welfare and the bond analysis, we conclude that the trial court did not abuse its discretion in terminating Mother's parental rights as to Section 2511(b). ***See In re Adoption of S.P.***, 47 A.3d at 826-827. Accordingly, we affirm the termination decree.

Decree affirmed.

---

[3] ***See*** N.T., 2/24/14, at 45, 71.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/8/2014