**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF: Z.D.C.-C., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.E.C., MOTHER | : : : : : : : | |
| | : | No. 1133 WDA 2022 |

Appeal from the Decree Entered September 2, 2022
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
29A IN ADOPTION 2022

| | | |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF: F.M.C., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.E.C., MOTHER | : : : : : | |
| | : | No. 1134 WDA 2022 |

Appeal from the Decree Entered September 2, 2022
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
29 IN ADOPTION 2022

BEFORE:  BENDER, P.J.E., LAZARUS, J., and McLAUGHLIN, J.

MEMORANDUM BY BENDER, P.J.E.:                    **FILED: APRIL 3, 2023**

C.E.C. (Mother or Appellant) filed appeals from the decrees entered on September 2, 2022, that granted the petitions filed by the Erie County Office of Children and Youth (Agency) to involuntarily terminate Mother's parental rights to her minor children, F.M.C. (born in July of 2020), and Z.D.C.-C. (born

in June of 2021) (collectively Children).[1]  Following our review, we affirm the decrees on appeal.[2]

The trial court set forth an extensive factual and procedural history of this case in its opinion that provided the background of this case, which began shortly after F.M.C. was born, when it was determined that his umbilical cord tested positive for THC and methamphetamines.  The court discussed the evidence presented at each of the hearings held over the course of the case, including five adjudication and dispositional hearings that began in February of 2021 after F.M.C. was removed from Mother's care.  When Z.D.C.-C. was born, he was immediately removed from Mother's care.  The court's opinion includes information about Mother's cooperation or lack thereof with submitting to drug testing, her inability to maintain adequate housing and employment, and her continued contact with Father, who subjected Mother to domestic violence.

The Agency filed the termination petitions in June of 2022, and the involuntary termination trial (IVT) was held on August 31, 2022.  Both Mother and Father were represented by counsel, as were the Children.  The court's opinion listed all the individuals who testified and provided extensive

_____

[1] M.D.C.'s (Father) parental rights to the Children were also terminated on the same date as Mother's rights were terminated; however, Father did not file appeals.

[2] This Court consolidated Mother's two appeals *sua sponte* by order dated November 8, 2022, in that they involve related parties and issues.  **See** Pa.R.A.P. 513.

information relating to each witness's testimony. The witnesses included John Drozdowski, a police officer from the Millcreek Police Department, and Andrew Hayes, a police officer from Erie County. Additionally, the court heard testimony from Tiffany Walker, a house manager at Mercy Center, Lindsey Miller, a case manager at Mercy Center, Kristina Szczesny, another case manager, Lisa Kobusinski, an employee with Project First Step, a parental program with Erie Homes for Children and Adults, and Agela Leggett, a case aid for the Agency. The court also heard testimony from Mother. Based upon the testimony and the exhibits submitted into evidence, the court determined that the Agency had demonstrated that Mother's parental rights should be terminated and that the termination was in the Children's best interests.

Mother filed timely notices of appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On appeal, Mother presents the following issues for our review:

A. Whether the Orphans' Court committed an error of law and/or abused its discretion when it concluded that termination of parental rights was supported by clear and convincing evidence pursuant to 23 Pa.C.S.[] § 2511(a)(1), (2), (5) and (8)?

B. Whether the Orphans' Court committed an error of law and/or abused its discretion when it concluded that termination of parental rights was supported by clear and convincing evidence pursuant to 23 Pa.C.S.[] § 2511(b)?

Mother's brief at 3.

We review an order terminating parental rights in accordance with the following standard:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the

- 3 -

decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (quoting *In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005)). Moreover, we have explained that:

The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* at 276 (quoting *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)). The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa. Super. 2003).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his

- 4 -

or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511, other citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *R.N.J.*, 985 A.2d at 276.

With regard to our review, we note that the court's opinion set forth the applicable standard of review and the portions of 23 Pa.C.S. § 2511(a)(1), (2), (5), (8) and (b), which it found were applicable to this matter. Moreover, the court's opinion discussed the facts it found credible, which supported its findings and conclusions. Specifically, the court stated:

> In the instant case, the record demonstrates by clear and convincing evidence that the termination of Appellant's parental rights was proper as Appellant failed to alleviate the conditions that led to the [C]hildren's removal. In fact, the record is replete with evidence that Appellant spent more time trying to deceive the people that were trying to help than she did recognizing and alleviating the circumstances that brought her [C]hildren into the care of the Agency.
>
> Even at the time of the IVT trial, Appellant was still unable and unwilling to admit her need for drug treatment or acknowledge her positive drug tests were a result of her drug use. The common theme throughout this dependency action was Appellant's inability to take responsibility for anything. Appellant's behaviors became more erratic throughout the life of the case as her manipulation tactics began to fall flat with the [c]ourt and her service providers. The [c]ourt has no doubt that had Appellant spent [more] time working her treatment plan than [she] spent calculating ways to manipulate her drug testing and the people

around her[,] this case would have had a completely different outcome.

While there are clearly discrepancies between Appellant's drug test results at Esper and the Mercy Center, this [c]ourt has no doubt as to the accuracy of Appellant's positive methamphetamine tests. The evidence in this matter speaks for itself. Appellant's known drug of choice is methamphetamine[;] in fact she used it while pregnant with both [C]hildren. She had no choice [but] to admit to using methamphetamine while pregnant with F.M.C. after his umbilical cord tested positive for the substance. Then[,] despite being open with the Agency and having F.M.C. removed from her care, she again used methamphetamine while pregnant with Z.D.C.-C. Yet she expects the [c]ourt to believe she only used the substance while pregnant and any positive urine tests since then were caused by her inhaler. Additionally, the items located in Appellant's room, *i.e.*, rolling papers next to white powder, aluminum foil with burn marks and residue and hollowed out pens, are all familiar to this [c]ourt as paraphernalia associated with drug use.

Appellant's actions demonstrate her willingness to use manipulation tactics to control the results of her drug tests. First, due to the discrepancies in her urine testing[,] Appellant was given the opportunity to submit to hair follicle testing, which she should have jumped at to demonstrate her sobriety, yet the record reflects otherwise. When Ms. Miller informed Appellant about the hair follicle testing, she credibly testified Appellant became upset and erratic. Instead of immediately getting the test done, Appellant spent the next several days avoiding Ms. Szczesny. Appellant then got a short reprieve when she was unable to leave the Mercy Center due to a quarantine. As soon as the quarantine period ended, Appellant bleached her hair and continued to avoid contact from Ms. Miller and Ms. Szczesny. When confronted by Ms. Miller on January 24th, Appellant still avoided the subject[,] stating she will get the follicle testing done on January 27th, fourteen (14) days after it was ordered by the Court.

Next, the [c]ourt notes Ms. Miller's credible testimony regarding Appellant's avoidance tactics when asked to produce a urine [sample] on March 16th. In this instance, the record reflects Appellant attempted to deflect and avoid the testing:

> Stating she could not pee, [s]aying that she needed to go out for a smoke, [t]here was some water drinking. During this time the house manager followed her around and supervised her for the course of a couple of hours in order to get a urine [sample]. And at this point in time there [were] some red flag concerns about that avoidance behavior. [Appellant] was observed to be reaching into her pockets in a discreet manner trying to rearrange or grab something from her pockets during this outside smoke break.

N.T. at 94-96. Eventually, Appellant did provide a urine [sample] and the cup was noted to be cold to the touch causing staff to believe she dipped it in the toilet water to dilute it. The following morning Appellant was woken up so that staff could obtain her urine first thing to avoid tampering, and presumably use of her inhaler. Appellant's urine test was positive for methamphetamine.

Finally, after Appellant was discharged from the Mercy Center, Ms. Miller located a bag of urine in Appellant's coat pocket. Ms. Kobusinski credibly testified that Appellant told her she purchased the bag of urine to beat her drug test because she had used a vape pen containing marijuana. Not only is this an example of another manipulation tactic on Appellant's part, but it also contradicts her testimony at the IVT trial. Specifically, Appellant described to the [c]ourt that it would be impossible to bring urine into Esper to beat a urine test. Clearly, she did not believe that to be true or she would not have purchased a bag of urine to ensure a negative drug test for marijuana.

Ultimately[,] Appellant's lack of accountability for her actions makes it impossible for her to do anything but work a treatment plan on the surface. Without acknowledging her drug use, need for treatment, and [the] danger her relationship with Father poses to her and the C]hildren[,] Appellant will never be able to alleviate the circumstances that led to the [C]hildren's dependency. Therefore, the record supports the [court's] termination of Appellant's parental rights under [23] Pa.C.S.[] § 2511 (a)(1), (a)(2), (a)(5) and (a)(8).

Likewise, the record supports the [court's] finding that terminating Appellant's parental rights was in the best interest of the [C]hildren under [23] Pa.C.S.[] § 2511 (b). Ms. Szczesny

testified the [C]hildren were both doing well in their foster home and were bonded with the foster parents. The testimony established F.M.C. has collectively only spent seven (7) out of the twenty-four (24) months of his life in Appellant's care and Z.D.C.-C. has been in foster care since his birth, except for his short stay at the Mercy Center.

While F.M.C. may very well have a bond with Appellant, the record reflects he has a strong bond with his foster parents, who are able to keep him safe. In fact, Ms. Szczesny credibly testified F.M.C. transitioned right back into the care of his foster parents after he was removed from the Mercy Center. Additionally, she testified F.M.C. has demonstrated the most stability she has seen since his visits with Appellant stopped.

As noted by the [C]hildren[']s legal counsel[,] Appellant[']s inability to stop using drugs and maintain safe living conditions while she was in a supervised capacity at the Mercy Center speaks volumes for her overall ability to keep [the Children] safe outside of a controlled environment. Ultimately, Appellant's inability to keep the [C]hildren safe and secure outweighs any bond she may have with them. (**See In re G.M.S.**, 193 A.3d 395, 401 (Pa. Super. 2018) ("In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent."). Therefore, the [c]ourt found the termination of Appellant's rights was in the [C]hildren's best interest … so that they could obtain permanency.

Trial Court Opinion, 10/31/2022, at 34-36.

Based upon the facts found by the trial court that our review reveals are supported by the evidence of record, we discern no abuse of discretion in its conclusion that the asserted grounds for seeking termination of parental rights are valid and that terminating Mother's parental rights would best serve the developmental, physical, and emotional needs and welfare of the Children.[3]

---

[3] We further observe that the attorney representing the Children filed a brief in support of the trial court's decision to terminate Mother's parental rights.

Accordingly, we affirm the trial court's decrees terminating Mother's parental rights to the Children.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/3/2023