J-A19014-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: B.R., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.K., BIRTH MOTHER | No. 2006 WDA 2014 |

Appeal from the Order Entered November 12, 2014
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s): TPR082 OF 2014

| | |
|---|---|
| IN RE: A.R., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.K., BIRTH MOTHER | No. 2007 WDA 2014 |

Appeal from the Order Entered November 12, 2014
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s): TPR083 OF 2014

BEFORE: BENDER, P.J.E., JENKINS, J., and MUSMANNO, J.

MEMORANDUM BY BENDER, P.J.E.:                    **FILED AUGUST 25, 2015**

S.K. ("Mother") appeals from the orders involuntarily terminating her parental rights to B.R. (born in July of 2007), and A.R. (born in March of 2010) (collectively "the Children"), pursuant to 23 Pa.C.S. § 2511(a)(2), (a)(5), (a)(8), and (b).[1] We affirm.[2]

---

[1] The parental rights of M.R., the Children's father ("Father"), were also involuntarily terminated. Father filed a separate appeal which is docketed at Nos. 2048 WDA 2014 and 2049 WDA 2014.

[2] By order dated January 5, 2015, this Court consolidated these appeals *sua sponte*.

In its opinion, the orphans' court set forth the following history of this case:

The family first came to the attention of CYF[3] in October 2011 following allegations that the children were alone outside. There were also concerns that the family was being evicted and that the parents were using drugs. When CYF arrived, they were not given access to the children. Crisis-in-home services were obtained to assist the parents on stabilizing their housing situation. CYF opened a case at that time. The service provider closed out unsuccessfully a month later in November 2011, but first wanted to verify the children's safety. The children and Mother had been staying with grandparents. In early April 2012, CYF learned of Mother's attempted suicide. CYF sought and obtained an Emergency Custody Authorization ("ECA") on April 2, 2012.

The children were removed from their Mother's care; Father had left the home months prior. Mother was in the I.C.U. after attempting to end her life, and Father could not be a caregiver as he did not have housing, was [a] perpetrator of domestic violence, as well as a Suboxone addict. The children were temporarily placed in an Auberle foster home while awaiting a shelter hearing, as their grandparents had criminal histories and did not pass CYF's emergency clearances. But at the shelter hearing, it was determined that B.R. could be placed with his Paternal Grandmother … and that A.R. could be placed with Maternal Step-Grandmother …. There the children have remained. The children were adjudicated dependent on April 30, 2012. The petition to involuntarily terminate the parents' rights was filed on May 13, 2014.

Orphans' Court Opinion (O.C.O.), 1/26/15, at 3-4 (citations to the record omitted).

A hearing on the termination of parental rights petition was held on November 12, 2014. In addition to Mother's testimony, the court heard

---

[3] The Allegheny County Office of Children, Youth and Families ("CYF").

testimony from Mary Hughes, a CYF caseworker, from psychologist, Dr. Neil Rosenblum, and from the Children's Paternal Grandmother, Anna Ritter. Based upon the evidence and testimony provided, the orphans' court entered its orders terminating Mother's parental rights to the Children.

Mother filed timely notices of appeal and a concise statement of errors complained of on appeal in compliance with Pa.R.A.P. 1925(a)(2)(i) and (b). She now raises the following issue for our review:

> Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the children pursuant to 23 Pa.C.S. § 2511(b)?

Mother's Brief at 7.

Our standard of review regarding orders terminating parental rights is as follows:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005). In termination cases, the burden is upon the petitioner to prove by clear and convincing evidence that

the asserted grounds for seeking the termination of parental rights are valid.

*Id.* at 806.  We have previously stated:

> The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003).

The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence.  *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004).  If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result.  *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa. Super. 2003).  Additionally, this Court "need only agree with [the trial court's] decision as to any one subsection in order to affirm the termination of parental rights."  *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004).

The termination of parental rights is controlled by 23 Pa.C.S.A. § 2511. Under this statute, the trial court must engage in a bifurcated process in which it initially focuses on the conduct of the parent under Section 2511(a). *See In the Interest of B.C.*, 36 A.3d 601 (Pa. Super. 2012).  If the trial court determines that the parent's conduct warrants termination under Section 2511(a), it must then engage in an analysis of the best interests of the child under Section 2511(b).  *See id.*

In the instant case, Mother does not challenge the trial court's analysis as it relates to her conduct under Section 2511(a); but rather she limits her argument to the trial court's analysis of the best interests of the Children under Section 2511(b).

Section 2511(b) provides, in pertinent part:

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(b).

Pursuant to Section 2511(b), the trial court must take into account whether a natural parental bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. *In re. C.S.*, 761 A.2d 1197, 1202 (Pa. Super. 2000) (*en banc*).

In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." In addition, we instructed that the orphans' court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* However, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *In re K.Z.S.*, 946 A.2d 753, 763 (Pa. Super. 2008).

While a parent's emotional bond with his or her child is a major aspect of the Subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. The mere existence of an emotional bond does not preclude the

termination of parental rights. Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." As we explained in *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010):

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (citation omitted).

Mother argues that the termination of her parental rights "may unnecessarily and permanently terminate the loving relationship between these children and their mother." Mother's Brief, at 13. Mother asserts that she has a strong bond with her Children and that they benefit from contact with her. *Id.* at 17. Mother further avers that she was in substantial contact with Children outside the purview of CYF and that "[t]he impact of this contact was not properly assessed by the trial judge who completely ignored [her] credible and unrefuted testimony that A.R. was living with her for many months." *Id.* at 17. She claims to also have had substantial contact with B.R. *Id.* Mother expresses concern over the impact on her visitations with B.R. in the event that her relationship deteriorates with Paternal Grandmother. *Id.* at 19. Finally, Mother argues that termination of her parental rights also jeopardizes the Children's relationship with each other. *Id.* at 13, 18.

In support of its conclusion that termination is in the Children's best needs and welfare, the court referenced some of Dr. Rosenblum's testimony concerning the Children individually, their bond with Mother, and the Children's individual relationships with Paternal Grandmother and Maternal Step-Grandmother.  O.C.O. at 7-9.  The court also addressed Mother's current addictions and mental state.  *Id.* at 8-9.  Specifically, the court reasoned:

> Dr. Rosenblum conducted five evaluations with five reports. When he first met B.R., soon after he came into Paternal Grandmother's care, the child showed signs [of] delays.  The child appeared somewhat unsocialized.  He had a very short attention span and would become very easily distracted.  He also demonstrated aggressive behavior.  The child was not even able to engage in much conversation with Dr. Rosenblum.  Dr. Rosenblum testified that B.R. showed signs of Addition [*sic*] Deficit Hyperactivity Disorder (ADHD) and a Disruptive Behavioral Disorder, demonstrated by impulse control difficulties.  His global assessment of his mental health functioning reflected a moderate level of impairment.  Dr. Rosenblum referred the child to individual counseling and advised Paternal Grandmother how to best address his needs. Only seven months later, at his second evaluation, B.R. "very definitely" showed signs of behavioral improvement.  He had much better self-control, better social skills, and had a much more productive personal adjustment.  Dr. Rosenblum testified that his caregiver and pre-adoptive foster mother, Paternal Grandmother, is "highly responsible for the improvements…."
>
> As far as A.R. was concerned, Dr. Rosenblum found her to be very age appropriate in her behavior.  Dr. Rosenblum testified that in her case with her pre-adoptive foster mother, Maternal Step-Grandmother – much as Dr. Rosenblum found with B.R. and his caregiver – that A.R. was receiving excellent care and developing well.  Dr. Rosenblum testified that there was very definitely an attachment between A.R. and her foster mother.

Dr. Rosenblum testified that the bond between the children and their Mother is not that of a caregiver relationship. He testified that the children know who she is and that they love her, but that it is not a bond … in which there is a representation of Mother meeting the children's needs. They do not emotionally depend on Mother, and therefore, according to Dr. Rosenblum, the attachment is far less relevant than it was when the children first left their Mother's care. According to Dr. Rosenblum, the attachment is not so necessary and beneficial that the termination should not occur. In his opinion, the children will have a sense of closure, and the level of contact with Mother will continue but simply not in a primary parenting capacity.

Insofar as Mother's case is concerned, credible expert testimony was proffered to suggest that termination would not deprive the children of love, companionship and affection of their biological mother. It is clear, by virtue of the generally positive familial relationship that Mother has with both children's respective pre-adoptive foster parent that her presence in the children's lives will continue. What a legal termination of Mother's rights accomplishes is that it will allow the children to develop in a healthy and safe environment while in the care of the person they each identify as their primary emotional caregiver. Mother simply cannot offer this environment, and she cannot be this type of caregiver.

Mother still has drug addiction problems. She testified that she was still using as of June 2014. Apart from addiction issues, Mother has issues with depression. Dr. Rose[n]blum testified that in addition to her opioid addiction, Mother also presented a major depressive disorder, with which she still struggles. Dr. Rosenblum testified that Mother "really has made no progress in the past two years." She still uses Suboxone, which she has bought off the street. Her mental health "has not at all remained consistent." Mother still struggles with panic attacks and anxiety. Dr. Rosenblum testified that she presented herself "even more depressed than she ha[d] been two year prior." Mother's mental health problems led to a suicide attempt in 2012, and they were the initial cause that the children were removed from her care. It is simply in the children's best interest that their primary caregivers are their pre-adoptive foster parents. To rule otherwise would be so detrimental to the children and to their Mother, that it borderlines the irresponsible.

As far as the relationship between the children and their siblings, this Court cannot believe that such a relationship is even remotely in jeopardy. It is true that the children will [grow] up in different homes, but truly there is no alternative. Meanwhile, both B.R. and A.R. regularly see one [an]other. To be clear, there was testimony that B.R.'s foster mother – who is Father's mother – and A.R.'s foster mother – who is Mother's step-mother – do not always see eye-to-eye, especially during the time immediately preceding the TPR trial. That said, the caseworker testified very credibly that the disagreements which have occurred were likely motivated by the stress of the TPR hearing. The caseworker elaborated in detail that she was not concerned about contact going forward.

*Id.* at 7-9. (citations to the record omitted).

In response to Mother's argument on appeal, we note that the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition. *See In re K.K.R.-S.*, 958 A.2d 529. (Pa. Super. 2008). It is clear from the court's discussion, quoted above, that the court valued Mother's relationship with Children. Nonetheless, the court concluded that termination of Mother's parental rights was in the Children's best interests.

Our review of the record reveals that the court's findings are supported by evidence presented at the hearings. Furthermore, we defer to the court's credibility determinations, and discern no abuse of discretion in its findings as to credibility. *See In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012). Accordingly, we conclude that the court did not abuse its discretion in terminating Mother's parental rights to the Children pursuant to section 2511(b). Thus, we affirm the court orders terminating her parental rights.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/25/2015