J-E04005-24

2025 PA Super 152

| IN RE: ADOPTION OF G.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| APPEAL OF: FAYETTE COUNTY CHILDREN AND YOUTH SERVICES | : | No. 936 WDA 2023 |

Appeal from the Decree Entered August 2, 2023
In the Court of Common Pleas of Fayette County Orphans' Court at
No(s): 27 ADOPT 2022

| IN RE: ADOPTION OF T.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| APPEAL OF: FAYETTE COUNTY CHILDREN AND YOUTH SERVICES | : | No. 937 WDA 2023 |

Appeal from the Decree Entered August 2, 2023
In the Court of Common Pleas of Fayette County Orphans' Court at
No(s): 28 ADOPT 2022

BEFORE: LAZARUS, P.J., PANELLA, P.J.E., STABILE, J., DUBOW, J., KUNSELMAN, J., MURRAY, J., McLAUGHLIN, J., SULLIVAN, J., and BECK, J.

OPINION BY BECK, J.: **FILED: JULY 21, 2025**

In these consolidated cases, Fayette County Children and Youth Services ("CYS") appeals from the decrees entered by the Fayette County Orphans' Court ("orphans' court") denying its petitions to involuntarily terminate the parental rights of C.W. ("Mother") to her minor children, G.W., born in

November 2014, and T.W., born in October 2018, (collectively, "Children").[1] CYS argues that the orphans' court abused its discretion by determining that CYS failed to prove, by clear and convincing evidence, that Mother's rights should be terminated pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8) of the Adoption Act. Because we conclude that the orphans' court misapplied the law when considering whether CYS met its burden under section 2511(a)(8), we vacate the decrees and remand for proceedings consistent with this decision.

**Facts**

We glean the following from the certified record on appeal based upon the facts as found by the orphans' court below. At the inception of the underlying dependency cases that gave rise to the petitions, Children resided with Mother in Westmoreland County. On May 14, 2021, Mother was arrested and incarcerated after she attempted to break into a house—the adoptive home of her other children[2]—while under the influence and accompanied by Children, who were then ages six and two. N.T., 5/11-12/2023, at 13-14. As a result, the Westmoreland County Court of Common Pleas ("juvenile court")

---

[1] The orphans' court granted CYS's petitions to terminate the parental rights of the fathers of G.W. and T.W. Neither father has participated in these appeals.

[2] G.W. and T.W. are Mother's ninth and tenth children, respectively. Six of Children's older siblings have been adopted. Notes of Testimony ("N.T."), 5/11-12/2023, at 179. Two were raised by a relative after involvement with Westmoreland County Children's Bureau ("WCCB"). *See id.*

- 2 -

removed Children from Mother's care and placed them in WCCB's legal custody.[3] Orphans' Court Opinion, 8/4/2023, at 1 (Findings of Fact ("F.F.") ¶ 7). Children have been in the same foster home since three days after their initial removal. *Id.* (F.F. ¶ 9).

WCCB filed petitions to adjudicate Children dependent under the Juvenile Act.[4] Following a hearing, a hearing officer determined that removal from Mother had been clearly necessary, that clear and convincing evidence existed to substantiate WCCB's allegations in the petition, and that such facts established that Children were dependent as defined in the Juvenile Act.[5] CYS Exhibit 3 (Dependency Adjudication Order). In a July 9, 2021 order, the juvenile court adopted the hearing officer's findings and recommendations and adjudicated Children dependent. *Id.*

Specifically, the juvenile court found that Mother "had the children with her when committing a burglary" and that she was "impaired" during the incident. *Id.* The criminal charges against Mother for this incident remained pending at the time of the dependency adjudication hearing and Mother's conditions of bond prohibited contact with Children. *Id.*

---

[3] Children's fathers were not able or available to assume custody of them.

[4] 42 Pa.C.S. §§ 6301–6375.

[5] 42 Pa.C.S. § 6302 (defining "dependent child" as one who "is without proper care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health").

Mother's intoxication during her arrest was not an isolated incident; a week and a half before the arrest, "police were called because Mother was impaired." *Id.* Further, in the month preceding Mother's arrest, WCCB had received and investigated two referrals regarding Mother, including an April 2021 report alleging that Mother was using methamphetamines. *Id.* Although Mother told the caseworker that she had been "clean" for seven years, she refused to participate in drug screens at that time to verify her sobriety. *Id.* WCCB was also aware that in October 2020, just six months prior, Mother's and G.W.'s father's drug and alcohol use had required CYS (in Fayette County) to place Children with a relative for one month. *Id.* Once Mother began participating in agency drug screens, she tested positive for benzodiazepines. *Id.* WCCB also had concerns about Mother's mental health based upon Mother's "erratic behavior." *Id.*

Mother "agree[d] to the adjudication of dependency and recommendations for treatment." *Id.*[6] Mother's initial goals through her WCCB family service plan and the juvenile court's order included obtaining

_____

[6] We note that Pennsylvania Rule of Juvenile Procedure 1405, which addresses stipulations, permits parties to stipulate to the facts upon which the adjudication is based, not the actual adjudication itself. *See* Administrative Office of Pennsylvania Courts Office of Children and Families in the Courts, PENNSYLVANIA DEPENDENCY BENCHBOOK, at 7-5 (4th ed. 2024). Because an adjudication of dependency is a legal conclusion, only the juvenile court may decide if the facts support an adjudication of dependency. *See id.* The propriety of Mother's agreement in this respect, however, is not before us in this matter.

evaluations of, and attending follow-up treatment for, mental health and substance abuse; submitting to random screens; and participating in parenting education. Orphans' Court Opinion, 8/4/2023, at 2 (F.F. ¶ 10); N.T., 5/11-12/2023, at 16; CYS Exhibit 3 (Dependency Adjudication Order).

Mother was released from incarceration in or around late July 2021. Orphans' Court Opinion, 8/4/2023, at 2 (F.F. ¶ 11); N.T., 5/11-12/2023, at 13-14. On August 21, 2021, Mother underwent a mental health evaluation with Melissa Franks and attended four out of five sessions.[7] Orphans' Court Opinion, 8/4/2023, at 2 (F.F. ¶ 14); N.T., 5/11-12/2023, at 17, 22. Several days after her mental health evaluation, Mother called WCCB twice and made "nonsensical statements saying that [T.W.] was a robot," that Children's foster parents were selling T.W.'s organs, and that she wanted Children removed from the foster parents' home. Orphans' Court Opinion, 8/4/2023, at 2 (F.F. ¶ 15); N.T., 5/11-12/2023, at 20, 31.

Mother was not cooperative with drug screens, participating in only five out of twenty-seven screens.[8] Of those five, she tested positive for alcohol on two occasions. Orphans' Court Opinion, 8/4/2023, at 2 (F.F. ¶ 13); N.T.,

---

[7] The record is not clear as to whether the four out of five sessions pertained to the evaluation process or to mental health treatment.

[8] During one of the screens that Mother refused to undergo, the drug tester reported that Mother refused to submit to the test while drinking a beer in front of the drug tester. Orphans' Court Opinion, 8/4/2023, at 2 (F.F. ¶ 13); N.T., 5/11-12/2023, at 17.

5/11-12/2023, at 16-18. Mother reported undergoing a drug and alcohol evaluation through the Fayette County Drug and Alcohol Commission, but she did not allow WCCB to verify this. Orphans' Court Opinion, 8/4/2023, at 3 (F.F. ¶ 32); N.T., 5/11-12/2023, at 22.

Mother obtained housing in Fayette County and WCCB transferred the case to CYS in December 2021. Orphans' Court Opinion, 8/4/2023, at 2 (F.F. ¶ 16); N.T., 5/11-12/2023, at 19-20. Her goals at that time remained largely the same as they had been with WCCB: "[a]ddress drug and alcohol concerns[, d]emonstrate appropriate parenting, address mental health concerns, obtain and maintain appropriate housing, meet the daily needs of the children[,] and [] cooperate with [CYS]." N.T., 5/11-12/2023, at 132. Mother refused to sign the family service plan, insisting that she already completed her goals in Westmoreland County. Orphans' Court Opinion, 8/4/2023, at 2 (F.F. ¶ 26); N.T., 5/11-12/2023, at 132.

On December 21, 2021, shortly after the case transferred to Fayette County, Mother tested positive for methamphetamines. Orphans' Court Opinion, 8/4/2023, at 3 (F.F. ¶ 28); N.T., 5/11-12/2023, at 133-34. She subsequently underwent a drug and alcohol assessment, which indicated that she did not need treatment. However, as found by the orphans' court, "Mother … failed to provide honest information relative to her drug and/or alcohol use," refused to sign a release to permit CYS to provide information to the evaluator, and "reported that she had been 'clean' since 2014, despite the fact that

Mother tested positive for methamphetamines on [a] December 21, 2021 drug screen." Orphans' Court Opinion, 8/4/2023, at 3-4 (F.F. ¶¶ 28, 32); N.T., 5/11-12/2023, at 134-38, 247. After undergoing the updated assessment, Mother tested positive twice more, once for TCA[9] and once for alcohol. Orphans' Court Opinion, 8/4/2023, at 3 (F.F. ¶¶ 18-19); N.T., 5/11-12/2023, at 38. She also refused or was unavailable for multiple screens. Orphans' Court Opinion, 8/4/2023, at 3 (F.F. ¶ 18); N.T., 5/11-12/2023, at 38.

Mother signed a release to enable her to talk to SPHS, a mental health provider. N.T., 5/11-5/12/2023, at 137. According to CYS supervisor Jennifer Guseman ("Guseman"), SPHS reported that it had previously diagnosed Mother with schizophrenia in 2018; that Mother had restarted mental health treatment with SPHS in October 2021; that Mother refused medication management; and that SPHS closed out her case in March 2022. Orphans' Court Opinion, 8/4/2023, at 4 (F.F. ¶¶ 30-31); N.T., 5/11-12/2023, at 137, 167, 178-79, 238.[10] The orphans' court found that "Mother has failed to comply with recommended mental health treatment[] in that she was recommended for weekly treatment[] and she has not complied with this

_____

[9] "TCA" is not identified in the record but possibly stands for tricyclic antidepressants.

[10] The orphans' court made this finding based upon testimony by Guseman that was admitted without objection, including portions through cross-examination by Mother's counsel, though Mother denied during her testimony that she was ever aware that she had been so diagnosed with schizophrenia. N.T., 5/11-12/2023, at 240-43.

recommendation."[11]  Orphans' Court Opinion, 8/4/2023, at 4 (F.F. ¶¶ 31); N.T., 5/11-12/2023, at 137-38.

From February 2022 to May 2022, during the time that Justice Works Youth Care ("Justice Works") administered drug tests and supervised her visits with Children, "Mother consistently made inappropriate comments to Justice Works staff during supervised visits and/or drug tests, including comments about the caseworkers' bodies, how their clothes fit[, and] Mother's sex life," and her behavior was "bizarre, including answering the door in just a towel or bra and underwear, and then refusing to get dressed."  Orphans' Court Opinion, 8/4/2023, at 3 (F.F. ¶ 20); N.T., 5/11-12/2023, at 48-53.  Mother told the caseworker "that she leaves the door to her front porch unlocked so that if anyone is homeless, they may sleep on her couch there; and on many occasions the caseworker observed one or more random people in Mother's

_____

[11] Guseman testified that after the case transferred to CYS, Mother gave her a copy of the mental health evaluation performed by Franks.  N.T., 5/11-5/12/2023, at 137.  According to Guseman, Franks diagnosed Mother with "unspecified trauma and stress related disorder, alcohol use disorder, severe and sustained remission, per her report."  *Id.* at 167.  Mother reported to Franks that she had abused alcohol for about fourteen years, but that she ceased drinking in 2014 when she was pregnant with her youngest son, which Guseman knew not to be true based upon the incident that brought Children into care.  *Id.* at 170.  In response to cross-examination questions from Mother's counsel, Guseman testified that the Franks evaluation recommended that Mother obtain weekly outpatient trauma focused therapy to address past trauma that she had experienced throughout her life, but that the evaluator did not view weekly therapy as a necessary predicate to obtaining custody of her children.  *Id.* at 158-61.

home." Orphans' Court Opinion, 8/4/2023, at 3 (F.F. ¶ 21); N.T., 5/11-12/2023, at 50, 56-58.

The orphans' court found that Guseman "testified credibly that despite Mother's negative drug screens, Mother's behaviors continued to be very 'erratic', and it was indeterminable whether Mother's behaviors resulted from impairment or mental health issues." Orphans' Court Opinion, 8/4/2023, at 3 (F.F. ¶ 29); N.T., 5/11-12/2023, at 136. During a May 17, 2022 supervised visit at her home, however, Mother "reeked of alcohol," "appeared to be impaired," "slurred words," and "was nodding off while playing on the floor with [C]hildren." Orphans' Court Opinion, 8/4/2023, at 2 (F.F. ¶ 19); N.T., 5/11-12/2023, at 42-43. Justice Works administered a drug screen. When Justice Works told Mother that her screen was positive for TCA, "Mother became very upset and threw the cup with urine toward the caseworker," thereby bringing the visit to a premature end and resulting in criminal charges against Mother. Orphans' Court Opinion, 8/4/2023, at 2 (F.F. ¶¶ 19); N.T., 5/11-12/2023, at 42-43.

Mother also had repeated and ongoing involvement with the criminal justice system. Mother was convicted of harassment in connection with the urine-throwing incident. N.T., 5/11-12/2023, at 62-63, 233. Two weeks before the termination hearings, the criminal court sentenced Mother to ninety-eight days of incarceration. *Id.* at 233. The court ordered Mother to

serve this sentence consecutive to her criminal trespass sentence stemming from the incident that brought Children into care. *Id.* at 233.

Indeed, despite Mother's release from incarceration in or around July 2021, the original criminal trespass matter continued to impact Mother's ability to parent Children. Shortly after she was arrested for the urine throwing incident in May 2022, Mother became reincarcerated on pending charges of the theft of and escape from an ankle monitor connected to the trespass case. *See id.* at 234. Unable to make bail, she was reincarcerated in the Fayette County Jail while awaiting trial. Orphans' Court Opinion, 8/4/2023, at 5 (F.F. ¶ 51); N.T., 5/11-12/2023, at 234. Mother remained incarcerated awaiting trial at the time of the May 2023 hearings on CYS's termination petitions. N.T., 5/11-12/2023, at 234. Although Mother remained hopeful that she would be released in short order,[12] her release date was uncertain. *See id.* Once the criminal court disposed of the ankle monitor case, she still needed to transfer from Fayette County Jail to a state correctional institute to complete her sentence in the criminal trespass matter. According to Mother, she had surpassed her minimum release date in February

---

[12] Because she had been incarcerated while awaiting trial in the ankle monitor case for almost a year, Mother anticipated a filing by her lawyer asserting her speedy trial rights if the Commonwealth did not bring her to trial within the following month. N.T., 5/11-12/2023, at 234-35. Mother also appeared to believe that her time in jail on the ankle monitor case would be credited to her criminal trespass case. *See id.* at 243. Mother's other potential avenue for relief was a petition for post-conviction collateral relief on the trespass conviction that was still pending before the trial court judge. *Id.* at 235.

2023, and her maximum release date was a year away. *Id.* at 243. Once she served the remainder of her sentence in the criminal trespass matter, she would be able to begin serving her consecutive sentence for her harassment conviction from the urine-throwing incident. *Id.* at 234.

While she was in jail, Mother began attending Narcotics Anonymous ("NA") and Alcoholics Anonymous ("AA"), and she visited with Children virtually via short Zoom sessions and sends Children mail. Orphans' Court Opinion, 8/4/2023, at 4 (F.F. ¶¶ 34, 35); N.T., 5/11-12/2023, at 213, 236. Mother also completed four out of six sessions of a parenting education class but after the educator requested to observe a Zoom visit between Mother and Children, Mother became "upset" and "refused to complete the sessions." Orphans' Court Opinion, 8/4/2023, at 4-5 (F.F. ¶ 24); N.T., 5/11-12/2023, at 111-128.

## Termination of Parental Rights Petitions

On July 15, 2022, fourteen months after Children entered foster care, CYS filed petitions to involuntarily terminate Mother's parental rights. CYS sought termination under section 2511(a)(1), (2), (5), (8) and (b) of the Adoption Act, which provide as follows:

> **(a) General rule.** --The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*      \*      \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\*      \*      \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\*      \*      \*

**(b) Other considerations.** --The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (2), (5), (8), (b).

Hearings on the petitions occurred on May 11 and 12, 2023, twenty-four months after Children's removal from Mother's care.[13] CYS presented the testimony of WCCB supervisor Molly Clayton, Justice Works family resource specialists Anastasia Wooser and Breanna Lucas, Justice Works program director Laura Daumit, Child's Place parent educator Marlena Theodori, and Guseman. Mother presented the testimony of Fayette County Prison counselor Jamee Waligura and testified on her own behalf.

Following the hearing, the orphans' court, in relevant part, denied the petitions under each subsection pled as to Mother. The court issued its findings of fact and conclusions of law accompanying the decrees and explained its rationale under each subsection. In finding that CYS failed to meet its burden of proving termination under section 2511(a)(8), the orphans' court acknowledged that CYS proved that Children had been removed from Mother and that twelve or more months had elapsed since their removal. Orphans' Court Opinion, 8/4/2023, at 10. The orphans' court opined that CYS's (a)(8) claim failed, however, because "clear and convincing evidence

---

[13] The orphans' court appointed Attorney David Tamasy to represent Children's legal interests in accordance with 42 Pa.C.S. § 2313(a). Attorney John A. Kopas, who represents Children in their dependency matter, represented Children's best interests as guardian ad litem in the termination matter. Both attorneys advocated for the termination of Mother's parental rights, although only Attorney Tamasy participated in this appeal. **See** Orphans' Court Opinion, 8/4/2023, at 4 (F.F. ¶ 45); Children's Supplemental Brief at 41.

has not been presented that the conditions which led to the removal continue to exist and termination would best serve the needs and welfare of [Children]." *Id.* The orphans' court determined that the conditions leading to Children's removal from Mother's care were Mother's involvement with the criminal justice system and concerns about Mother's mental health and drug and alcohol use. *Id.*; *see also id.* at 1-2 (Findings of Fact ("F.F.") ¶¶ 7, 10). Specifically, addressing the second and third elements of subsection (a)(8), the orphans' court found:

> Mother's conduct in this case certainly has been bizarre at times and unacceptable. A few of the most blatant examples include Mother greeting caseworkers without being properly clothed and making remarks to caseworkers of a sexual nature. At one time, Mother left a disturbing voicemail to a Westmoreland County caseworker about her child being a "robot," and the foster parents were selling her organs. These incidents, although disturbing, do not appear to be the norm, and do not evidence that Mother cannot or will not remedy the conditions which caused the removal.

> Mother clearly loves [Children], and this is best evidenced by Mother's consistent visitation with [Children]. Despite her incarceration, Mother has consistently visited, and she has requested additional visitation time. For the past year, Mother has been limited in her ability due to her incarceration. She has utilized the resources available to her while incarcerated, and she demonstrates the desire to remedy the conditions which led to the removal of [Children].

Orphans' Court Opinion, 8/4/2023, at 10-11.

The orphans' court elaborated upon its (a)(8) analysis in its Pa.R.A.P. 1925(a) statement in lieu of opinion, indicating that its

> findings of fact do include that Mother's compliance has not always been perfect with respect to the goals set for her by Fayette

- 14 -

[County] CYS.  However, the findings of fact also include that Mother has consistently demonstrated that she wishes to maintain her parental relationship with, and to care for, her children.  The length of time a child is in foster care, in itself, is not determinative of whether a biological parent's rights should be terminated, nor is less-than-stellar compliance by that parent.  Here, in fact, after permanency review hearings in October 2022, January 2023 and April 2023 hearings, [the juvenile court] consistently found that Mother was at least minimally compliant with her Family Service Plan.  Further, after the January 2023 and April 2023 hearings, [the juvenile court] found that Mother was as compliant as she could be, given her incarceration.  After consideration for [sic] the factors that [CYS] highlights as evidence of Mother's unsuitability *and* the factors that demonstrate Mother's dedication to maintaining her parental relationship with her children, there was not sufficient evidence to support termination of Mother's parental rights.

Orphans' Court Statement in Lieu of Opinion ("Statement"), 9/6/2023, at 2-3

(numbering supplied; italicized emphasis in original).

CYS filed a timely notice of appeal.[14]  CYS originally presented three

issues on appeal:

[1.] Whether [CYS] proved by clear and convincing evidence that the parental rights of [Mother] of [Children] should be involuntarily terminated?

[2.] Whether the [orphans'] court improperly excluded evidence of Mother's methamphetamine use?

[3.] Whether the denial of the petitions for termination of parental rights violates the Adoption and Safe Families Act?

---

[14] CYS did not comply with Pa.R.A.P. 1925(a)(2)'s directive to file its concise statement of matters complained of on appeal contemporaneously with its notice of appeal.  CYS filed a concise statement only after the orphans' court ordered it to do so.  The orphans' court then filed an opinion pursuant to Pa.R.A.P. 1925(a).  Because there has been no allegation of prejudice stemming from CYS's belated filing, we do not find that CYS has waived its issues for appeal.  ***See In re K.T.E.L.***, 9883 A.3d 745, 748 (Pa. Super. 2009).

CYS's Brief at 5 (suggested answers and unnecessary capitalization omitted).

After a divided three-judge panel affirmed the orphans' court's decrees, CYS sought and was granted reargument before the Court en banc. ***See*** Order, 6/24/2024. We directed the parties to file new or supplemental briefs to address the following issues in addition to any other properly preserved claim originally raised before this Court:

> (1) Whether the [orphans'] court erred in denying involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a); and
>
> (2) Whether the certified record on appeal is sufficient for this Court to conduct appellate review of whether [CYS] proved, by clear and convincing evidence, that Mother's parental rights should be terminated involuntarily pursuant to 23 Pa.C.S. § 2511(a)?

Order, 7/9/2024.[15]

_____

[15] The first court-directed issue essentially reframes CYS's original first issue as a more precise inquiry addressing this Court's appellate review of trial court error instead of CYS's burden in general.

The remaining two issues originally raised by CYS garner it no relief and warrant little discussion. CYS claims that the orphans' court improperly excluded evidence of Mother's methamphetamine use. ***See*** CYS's Brief at 20-21. This claim is unsupported by the record. The orphans' court found that Mother tested positive for methamphetamines, which was based upon the urine screen results that CYS admitted without objection. ***See*** Orphans' Court Opinion, 8/4/2023, at 3 (F.F. ¶ 28); CYS Exhibit 10; N.T., 5/12-13/23, at 133-35. What the court did not allow was the repetitive questioning of Mother attempted by counsel for CYS as to her bald denial that she used methamphetamines. ***See id.*** at 246-47.

*(Footnote Continued Next Page)*

## Legal Standards

Pursuant to the statutory scheme prescribed by the Adoption Act, courts must engage in a bifurcated process when considering a petition to terminate an individual's parental rights. Courts must begin by first considering whether a parent's conduct warrants termination under section 2511(a) prior to shifting its focus to whether termination best serves the child's needs and welfare. ***In re Adoption of R.J.S.***, 901 A.2d 502, 508 (Pa. Super. 2006).

Section 2511(a) "provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination." ***In re Adoption of C.M.***, 255 A.3d 343, 359 (Pa. 2021); ***see*** 23 Pa.C.S. § 2511(a)(1)-(11). Each subsection is distinct. The petitioner only needs to prove one of the grounds alleged under subsection (a) to shift the focus to section 2511(b), which requires the court to determine whether termination serves the children's developmental, physical, and emotional needs and welfare. ***In re K.R.***, 200 A.3d 969, 979 (Pa. Super. 2018) (en banc). The

---

CYS further contends that the orphans' court's denial of the termination petitions violates the federal Adoption and Safe Families Act ("ASFA"). In support of this argument, CYS cites only general law explaining the timelines required by ASFA—generally requiring the filing of a termination petition if a child has been in care for fifteen of the prior twenty-two months—and the policies behind the timeline. ***See*** CYS's Brief at 21-22. It is axiomatic that ASFA's timelines are not "applied mechanically." ***In re T.S.M.***, 71 A.3d 251, 268–69 (2013). Moreover, by its terms, ASFA does not mandate a court to terminate a parent's rights simply because a child has been in foster care for a prescribed length of time. ***See In re P.Z.***, 113 A.3d 840, 847 (Pa. Super. 2015).

party seeking termination must prove the elements of section 2511 by clear and convincing evidence, which is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***Matter of Adoption of L.C.J.W.***, 311 A.3d 41, 48-49 (Pa. Super. 2024) (citation omitted).

In reviewing the orphans' court's denial of CYS's petitions, we adhere to the following standard:

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the [orphans'] court if they are supported by the record, but it does not require the appellate court to accept the [orphans'] court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the [orphans'] court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will.

***C.M.***, 255 A.3d at 358-59 (quotation marks, brackets, and citations omitted). Further, in conducting our review, we take care to heed our Supreme Court's words of caution and abide by its specific instructions regarding our appellate role:

> Termination of parental rights is among the most powerful legal remedies that the judicial system possesses. The decision to sever permanently a parent's relationship with a child is often bound up in complex factual scenarios involving difficult family

dynamics and multiple service providers. Our trial courts are tasked with carefully considering and weighing all of the evidence presented at termination hearings in determining whether the petitioning party has met its burden of proving by clear and convincing evidence that termination meets the exacting standards outlined in the Adoption Act.

Because trial courts are on the front lines assessing the credibility of witnesses and weighing competing and often challenging evidence, it is paramount that, in reviewing trial courts' decisions in this arena, appellate courts defer to trial courts' first-hand observations as they relate to factual determinations. In this regard, we reiterate that appellate courts must review such decisions for an abuse of discretion or error of law, and appellate courts may reverse trial courts only when that discretion has been breached or when the law has been misapplied. In other words, an appellate court should review the certified record to decide whether it supports the trial court's order, regardless of whether the appellate court agrees with the result that the trial court reached.

*Interest of S.K.L.R.*, 256 A.3d 1108, 1129 (Pa. 2021); *see also In re Adoption of L.A.K.*, 265 A.3d 580, 597 (Pa. 2021) ("This Court has repeatedly stated that in termination cases involving close calls, deference to the trial court's determination is particularly crucial."). Stated another way, our job is to "review the record for an abuse of discretion and for whether evidence supports that trial court's conclusions"; we may not "search the record for contrary conclusions or substitute [our] judgment for that of the trial court." *S.K.L.R.*, 256 A.3d at 1124.

**Analysis of Section 2511(a)(8)**

Because CYS must prove only one of the grounds alleged under subsection (a), we focus our attention upon section 2511(a)(8). In accordance with the statutory language, an (a)(8) analysis requires a

- 19 -

determination of whether: (1) twelve months have elapsed since the juvenile court removed the children from the parent's care; (2) the conditions that led to the removal continue to exist; and (3) terminating the parent's rights serves the children's needs and welfare. *In re C.L.G.*, 956 A.2d 999, 1008-9 (Pa. Super. 2008) (en banc); 23 Pa.C.S. § 2511(a)(8).

As the citations in our summary of the facts at the outset indicate, each of the orphans' court's findings of fact are supported by the evidence in the certified record transmitted to this Court on appeal. Because we defer to the orphans' court's on-the-ground insight of the family, this means that we must affirm its decision as long as it correctly applied the law to its findings of fact, regardless of the conclusion that this Court would derive from the record if we were permitted to make the decision in the first instance.

We begin with the first prong of subsection (a)(8). As the orphans' court correctly observed, there is no question that this element was met, as Children had been removed from Mother's care for fourteen months at the time CYS filed the petitions to terminate Mother's parental rights. We therefore discuss only the latter two prongs seriatim.

Continued Existence of Conditions that led to Children's Removal

CYS argues that the orphans' court's own factual findings demonstrate that CYS introduced sufficient evidence to meet its burden to prove the statutory grounds to terminate Mother's parental rights under section 2511(a)(8). *See* CYS's Brief at 16; CYS's Supplemental Brief at 4. It asserts

that the orphans' court found the conditions that led to Children's removal still existed at the time of the hearing on its termination petitions two years later. CYS's Supplemental Brief at 3. CYS maintains that it sufficiently proved that Mother's continuous difficulties with mental health, substance abuse, housing, and the criminal justice system have prevented her from reunifying with Children. *See* CYS's Brief at 14-19; CYS's Supplemental Brief at 3-4. From CYS's perspective, the orphans' court erroneously focused upon Mother's love for her children instead of the evidence demonstrating that Mother's issues remain unresolved. CYS's Supplemental Brief at 2-3.

Our review of the orphans' court's legal conclusions and analysis in the instant case reveals several flaws. First, except for the general bifurcated legal analysis mandated by the Adoption Act, the orphans' court's conclusions of law are derived from legal standards solely applicable to subsection (a)(1), which addresses termination based upon parental abandonment. *See* Orphans' Court Opinion, 8/4/2023, at 8 (¶¶ 2-4) (quoting *In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004); *In re J.L.C.*, 837 A.2d 1247, 1250 (Pa. Super. 2003)). *B.,N.M.* in particular, which directs courts to consider the totality of the circumstances of each individual case, including all explanations offered by the parent, and not just the six-month period immediately preceding the filing of a petition, relates to the analysis specific to the statutory language of subsection (a)(1). *B.,N.M.*, 856 A.2d at 855. Similarly, the focus upon a parent's utilization of resources to maintain a parent-child

bond from jail espoused in both **B.,N.M.** and **J.L.C.** is pertinent only to the subsection (a)(1) analysis of whether a non-custodial parent abandoned a child, not all subsections in general.[16]  **See id.**; **J.L.C.**, 837 A.2d at 1250.

Although the orphans' court purported to analyze CYS's petitions separately under each subsection, the substance of its analysis reveals that it universally applied the conclusions of law it derived from subsection (a)(1). We recognize that factual matters under the Adoption Act do not always neatly fit into legal boxes, but our Supreme Court has emphasized time and again that we must hew closely to the statutory language.  **See, e.g., K.T.**, 296 A.3d at 1105 (analyzing the "pivotal language" of the statute); **In re Adoption of S.P.**, 47 A.3d 817, 827-28 (Pa. 2012) (cautioning this Court to avoid "improperly quoting" caselaw applying a different subsection because the statutory grounds are distinct and cannot be conflated).  The grounds are not interchangeable and a court errs by indiscriminately applying caselaw analyzing one subsection to another.  **See S.P.**, 47 A.3d at 827-28 (holding that the orphans' court erred by applying caselaw analyzing the (a)(1) abandonment subsection to the (a)(2) incapacity subsection); **I.J.**, 972 A.2d at 11 (holding that the orphans' court erred by "improperly conflat[ing] the

---

[16]  The petition at issue in **J.L.C.** was filed under (a)(1) and (8).  **J.L.C.**, 837 A.2d at 1250.  The portion cited by the orphans' court here pertained to the subsection (a)(1) analysis.  **See id.**

statutory requirements of subsections (a)(2) and (a)(5) with those of subsection (a)(8)").

Second, the orphans' court appears to have operated as though it could not recognize Mother's incarceration as part of the conditions that continued to exist. Our Supreme Court has held that this, too, is error. In *In re McCray's Adoption*, 331 A.2d 652 (Pa. 1975), which interpreted an earlier statute akin to subsection (a)(1), our Supreme Court observed that a parent "has an affirmative duty to love, protect and support his child and to make an effort to maintain communication and association with that child," but that incarceration made "performance of this duty 'more difficult.'" *S.P.*, 47 A.3d at 828 (quoting *McCray*, 331 A.2d at 665). The *McCray* Court determined that a

> parent's absence and/or failure to support [a child] due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child. Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.

*Id.* (quoting *McCray*, 331 A.2d at 665).

The *S.P.* Court observed that this Court often quoted this passage from *McCray* and its progeny to support the "assertion that incarceration alone cannot be grounds for termination under any provision of [section] 2511(a)." *S.P.*, 47 A.3d at 828. The Supreme Court explained that this was erroneous,

as the purpose of the passage "was to impose on the incarcerated parent, pursuant to an abandonment analysis, a duty to utilize available resources to continue a relationship with his or her child." *Id.* The statement was not a generalized pronouncement about the effect of incarceration on parental rights. Instead, the Supreme Court determined that "incarceration neither compels nor precludes termination." *Id.* The Court held that "incarceration, while not a litmus test for termination, can be determinative" of the elements of section 2511(a)(2). *Id.* Although section 2511(a)(8) was inapplicable in *S.P.* for different reasons, the Court noted that a majority of Justices in *In re R.I.S.*, 36 A.3d 567 (Pa. 2011) (plurality), agreed that a parent's incarceration can be a factor in an orphans' court's decision to terminate parental rights under several of the enumerated grounds, including whether the conditions leading to removal continued to exist pursuant to subsection (a)(8). *S.P.*, 47 A.3d at 829-30, nn. 8-9.

Lastly, in finding that CYS failed to satisfy its burden under the second prong of (a)(8), the orphans' court in the instant case emphasized the limitations imposed by Mother's incarceration, Mother's earnestness in visiting Children over Zoom, and Mother's "utiliz[ation of] the resources available to her while incarcerated." *See* Orphans' Court Opinion, 8/4/2023, at 7 (Conclusions of Law, ¶¶ 2-4). It further appeared to rely heavily on its conclusion that Mother demonstrated the desire "to remedy the conditions which led to [Children's] removal," as well as her wish "to maintain her

parental relationship with, and to care for, her children." Statement, 9/6/2023, at 3. It opined that Mother's "bizarre," "unacceptable," and "disturbing" behavior did "not evidence that Mother cannot or will not remedy the conditions which caused the removal." Orphans' Court Opinion, 8/4/2023, at 10. It further emphasized the findings in the dependency matter that Mother "was at least minimally compliant with her Family Service Plan" since October 2022 and that she "was as compliant as she could be, given her incarceration." *Id.* at 3.

The "relevant inquiry" concerning the second prong of subsection (a)(8) is "whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009); *see also Matter of Adoption of L.C.J.W.*, 311 A.3d 41, 51 (Pa. Super. 2024) (specifying that the pertinent issue "is whether, after a full year of services, [the parent] had remedied the conditions such that she was presently able to resume care and custody of her children").

By its plain language, "subsection (a)(8) does not require evaluating [a parent's] willingness or ability to remedy the conditions that initially caused placement, nor does it require an evaluation of the availability or efficacy of CYS services." *In re J.T.*, 817 A.2d 505, 509 (Pa. Super. 2003). Stated another way, pursuant to section 2511(a)(8), when one year has elapsed from the children's removal, the General Assembly has relieved the petitioner from

the burden of proving that the parent is incapable of, or unwilling to, remedy the conditions, circumstances, or conduct that led to the children's removal. This is unique to a subsection (a)(8) analysis.[17] The court's inquiry is no longer concerned with whether the parent is capable of change, or whether the parent has tried to change, but seeks only to discern if the parent has, in fact, changed.

Indeed, a parent's "progress toward remedying the conditions" is insufficient, as a matter of law, to warrant a finding in favor of the parent under the second prong of subsection (a)(8). *See In re Adoption of R.J.S.*, 901 A.2d 502, 512 (Pa. Super. 2006); *I.J.*, 975 A.2d at 11. Nevertheless, determining whether the conditions that led to the removal remain is less of a hyper technical task than it is a commonsense consideration of whether the conditions continue to stand in the way of reunification. *See S.K.L.R.*, 256

---

[17] *Compare*, *e.g.*, 23 Pa.C.S. § 2511(a)(1) (directing courts to examine the parent's conduct for evidence of intent to relinquish parental claim, or refusal or failure to perform parental duties), (a)(2) (directing courts to consider whether certain parental incapacity, abuse, neglect, or refusal cannot or will not be remedied by the parent), (a)(5) (directing courts to determine whether the parent cannot or will not remedy the conditions which led to the removal or placement of the child within a reasonable period of time and whether services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time), *with* (a)(8) (directing courts to decide whether the conditions that led to the placement or removal of the children continue to exist). Subsections (a)(1), (2), and (5) predated the General Assembly's addition of subsection (a)(8) to the Adoption Act's list of enumerated grounds for termination. The General Assembly added subsection (a)(8) in 1995 and it went into effect on February 18, 1997. *See* Act 76 of 1995 (H.B. 215), P.L. 685, §§ 3, 7(1).

A.3d at 1129 (holding that evidence in the record supported the trial court's conclusion that a parent who was ably parenting an infant eradicated the original conditions and was close to reunification with other children, despite briefly not attending mental health treatment because of a conflict with her work schedule); **C.L.G.**, 956 A.2d at 1006-07 (determining that the agency proved that the conditions continued to exist where the child was removed from a parent because of "drug issues," incarceration prevented her from parenting the child, was the direct consequence of the parent's drug use, and parent would need time to establish stability and sobriety after release notwithstanding parent's year-long sobriety in prison); *In re D.A.T.*, 91 A.3d 197, 205-06 (Pa. Super. 2014) (rejecting argument that petitioner must prove that all the original conditions continued to exist; although parent obtained housing and complied with visitation goal, her developmental disabilities still posed a safety risk), *abrogated on other grounds by In re K.T.*, 296 A.3d 1085, 1110 n.23, 1115 (Pa. 2023).

Importantly, nowhere does the orphans' court conclude that Mother **has** remedied the conditions that led to Children's removal. The law is clear that a finding that a parent "was making progress toward remedying the conditions," is legally insufficient to preclude termination under (a)(8). **R.J.S.**, 901 A.2d at 511; *see also C.L.G.*, 956 A.2d at 1006-08 (affirming termination of parental rights under (a)(8) even though parent made "substantial progress" and was sober in prison; that the parent was incarcerated for drug

offenses demonstrated that her "drug related issues continued to impact" her child and parent's "ability to care" for her child).

Applied to the proper legal framework, the orphans' court's findings unequivocally demonstrate that the conditions leading to Children's removal from Mother's care continued to exist at the time of the termination hearing. Children were placed in foster care because of Mother's arrest and incarceration, her substance abuse, and her mental health; at the time of the termination proceedings, the findings by the orphans' court reflect that Mother's battles with the criminal justice system and substance abuse, at the very least, persisted.[18]  **See** Orphans' Court Opinion, 8/4/2023, at 2-5 (F.F. ¶¶ 11, 13, 18-19, 28-29, 32, 51).

Mother's actions have resulted in numerous involvements with the criminal justice system.  Two years following Children's removal, Mother remained unable to care for Children because of her repeated incarcerations.

_____

[18]  CYS and Children's attorney argue that the other original condition—Mother's mental health concerns—continued to exist as well.  CYS's Supplemental Brief at 3; Children's Supplemental Brief at 24.  Despite finding that Mother was diagnosed with schizophrenia and that she was noncompliant with recommended mental health treatment, it appears that the orphans' court gave little weight to Mother's mental health as a factor in its ultimate decision.  **Compare** Opinion, 8/4/2023, at 4 (F.F. ¶¶ 30-31), **with id.** at 8-10.  CYS's presentation of evidence concerning Mother's mental health was not always straightforward and, unlike the other conditions, there is mixed evidence concerning the severity of Mother's mental health issues and what she would need to do and did do to address it.  Because there is ample evidence to support the orphans' court's findings concerning Mother's substance abuse and recurring involvement with the criminal justice system, we limit our analysis to those conditions.

Even assuming her innocence in the pending ankle monitor case (as we must in the absence of conviction), her recurrent incarcerations have prevented her from being available to parent Children with no definite release date.

This is not a situation where the children were about to be reunified and the parent's incarceration was a mere temporary setback. Mother had not even achieved unsupervised visitation prior to entering prison for a second time. Additionally, Mother's only sustained period of sobriety occurred in the confines of incarceration, with Mother relapsing several times after she was released from her initial incarceration. While relapses may be expected by a person struggling to overcome addiction, her relapses plus her second incarceration prevented her from gaining any traction towards reunification. Even assuming, arguendo, that Mother was released immediately after the hearing, she would need time to demonstrate that she could sustain her sobriety in the outside world. *See C.L.G.*, 956 A.2d at 1008 ("While it appears that [m]other has managed to remain drug-free in the confines of incarceration, whether she can maintain that status among the external pressures of the outside world remains to be proven.").[19]

This Court has recognized "that the application of section 2511(a)(8) may seem harsh when the parent has begun to make progress toward

---

[19] Mother has other real-world barriers to overcome. Although housing was not part of the original conditions that led to Children's removal, because Mother was evicted when she became incarcerated, she must reestablish housing upon release.

resolving the problems that had led to the removal of her children." **R.J.S.**, 901 A.2d at 513.

> However, by allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit [eighteen] months, in which to complete the process of either reunification or adoption for a child who has been placed in foster care.

**Id.** Applying the law as required under subsection (a)(8), the orphans' court's factual findings, which are supported by the record, demonstrate that CYS met its burden of proving that the conditions which led to Children's removal continued to exist two years after Children's removal and that these conditions remained barriers to reunification.

<u>Needs and Welfare under Sections 2511(a)(8) and (b)</u>

As its final prong, section (a)(8) requires a determination of whether "termination of parental rights would best serve the needs and welfare of the child." 23 Pa.C.S. § 2511(a)(8). Although section 2511(a) generally focuses on the behavior of the parent, the third prong of section 2511(a)(8) specifically "accounts for the needs of the child." **C.L.G.**, 956 A.2d at 1008-09. Similar to section 2511(a)(5), which contains an identical needs and welfare prong, the third prong of section 2511(a)(8) "is not a mere formality flowing from the existence of the preceding [two] elements enumerated in the

statute." ***See In re P.A.B.***, 570 A.2d 522, 525 (Pa. Super. 1990) (holding

that the orphans' court committed an error of law by implying that satisfaction

of the preceding four prongs of section 2511(a)(5) required the conclusion

that termination would best serve the children's needs and welfare without

considering the needs and welfare prong as a discrete consideration).[20]

---

[20] Section 2511 refers to the child's "needs and welfare" three times: twice as the final prong of two of the eleven provisions listing the "grounds" for termination of parental rights in subsection (a), and once in subsection (b), which is applicable to all terminations of parental rights, regardless of the particular basis for termination raised under subsection (a). ***Compare*** 23 Pa.C.S. § 2511(a)(5), (8) (including as the final element that "termination of the parental rights would best serve the needs and welfare of the child") ***with id.*** § 2511(b) (specifying that "[t]he court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child").  As the quoted language makes clear, this portion of section 2511(a)(8) is similar, but not identical to, section 2511(b).

Nonetheless, appellate courts have not addressed the language differences and have not engaged in a full statutory analysis to discern the General Assembly's intent of including multiple provisions addressing the child's needs and welfare. ***See*** 1 Pa.C.S. §§ 1921(a), 1922(2).  Whether this is because of the similarity of the language, ***see R.I.S.***, 36 A.3d at 579 n.3 (plurality) (Baer, J., concurring), or because the issue has not been squarely presented for consideration on appeal, our current precedent interprets the needs and welfare analyses required under subsections (a)(8) and (b) to utilize the same legal standards and to be based upon the same evidence. ***See, e.g., C.L.G.***, 956 A.2d at 1008-09 (although recognizing that subsections (a)(8) and (b) "are distinct" and finding "we must address [s]ection 2511(a) before reaching [s]ection 2511(b)," holding that both subsections "direct us to evaluate the 'needs and welfare of the child,'" and relying upon identical evidence to satisfy the analysis under both subsections); ***see also Matter of Adoption of M.A.B.***, 166 A.3d 434, 448 (Pa. Super. 2017) (combining discussion of the children's needs and welfare pursuant to subsection (a)(8) and subsection (b) because the "third element of [s]ection 2511(a)(8) requires that the [o]rphans' [c]ourt conduct an analysis similar to that required under [s]ection 2511(b)").  Our Supreme Court has similarly
*(Footnote Continued Next Page)*

When considering whether termination of parental rights serves a child's needs and welfare, courts must consider the matter from each child's perspective, placing the child's "developmental, physical, and emotional needs and welfare above concerns for the parent." *K.T.*, 296 A.3d at 1105-06. Our Supreme Court has cautioned that "the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved." *In re T.S.M.*, 71 A.3d 251, 268-69 (Pa. 2013).

When determining whether the petitioner met its burden to prove that termination best serves a child's needs and welfare, the orphans' court must consider, at a minimum, the factors delineated by our Supreme Court in *K.T.*, all of which are of "'primary' importance in the [s]ection 2511(b) analysis" and "may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare." *K.T.*, 296 A.3d at 1109.

---

applied caselaw interpreting the needs and welfare prong of section 2511(a)(5) to the needs and welfare provision of section 2511(b). *See K.T.*, 296 A.3d at 1098 n.12 (noting that this Court first examined whether a parent-child bond was "necessary and beneficial" to the child pursuant to the needs and welfare prong in subsection (a)(5) in *P.A.B.*, which the Supreme Court then endorsed and adopted for use in a section 2511(b) needs and welfare analysis in *E.M.*, 620 A.2d at 484-85)).

Because we do not have advocacy upon the distinctions, if any, between the needs and welfare provisions in subsections (a)(8) and (b), we simply apply this prior precedent interpreting the two provisions congruently and using the same legal analysis for subsections (a)(8) and (b).

The orphans' court must determine whether the parent and child share an emotional bond and assess whether the bond is "necessary and beneficial" to the child, such that "maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *Id.* If a bond exists, the court must ascertain the effect upon the child of severing the bond. *Id.* Because the severing of any parent-child bond may be emotionally painful for a child, the orphans' court cannot preclude termination based solely on evidence of an "adverse" or "detrimental" impact to the child. *Id.* at 1110-11. Instead, focusing upon the "child's development, and mental and emotional health," the orphans' court should assess whether severing the bond "is the kind of loss that would predictably cause extreme emotional consequences or significant, irreparable harm" to the child. *Id.*

The parent-child bond, however, is "but one part of the overall subsection (b) analysis." The orphans' court must also consider:

> the child's need for permanency and length of time in foster care consistent with [the Juvenile Act,] 42 Pa.C.S. § 6351(f)(9) and [ASFA], 42 U.S.C. §§ 675(5)(C), (E); whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability.

*Id.*

When conducting "a full subsection (b) analysis focused upon the child," the orphans' court has "discretion to place appropriate weight on each factor present in the record." *Id.* at 1113. However, when "weighing the difficult

factors discussed above, courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly." *T.S.M.*, 71 A.3d at 269.

Here, the orphans' court found that CYS failed to present clear and convincing evidence that termination would best serve the needs and welfare of Children pursuant to subsection (a)(8). Orphans' Court Opinion, 8/4/2023, at 10. In support, the orphans' court reasoned that Mother loves Children, desires to parent them, and has made efforts to reunify with them—all of which is best evidenced by her consistent visitation, including while incarcerated. *Id*. at 10-11; *see also* Statement, 9/6/2023, at 2-3.

CYS argues that the orphans' court erred in this conclusion, as our law provides that "a parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights," and Children have the superior right at this point "to have proper parenting and fulfillment of [their] potential in a permanent, healthy, safe environment." CYS's Brief at 18-19 (quoting *Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010); *In re B., N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004)).

Once again, despite our deference to the orphans' court's factual findings and our stringent standard of review, we conclude that the orphans' court erred by using an incorrect legal standard to assess Children's needs and welfare under the third prong of subsection (a)(8). A parent's efforts and some progress towards reunification is irrelevant to, and cannot form the basis

of, a needs and welfare analysis under subsection (a)(8). ***I.J.***, 972 A.2d at 12.

Furthermore, like the orphans' court in ***K.T.***, the orphans' court here erroneously truncated its analysis once it determined there was a "connection" between Mother and Children. ***See*** Orphans' Court Opinion, 8/4/2023, at 10-11; ***see also id.*** at 5 (F.F. ¶¶ 42-43). "[A]n emotional bond with a parent is legally insufficient to preclude termination of parental rights without determining whether such bond is necessary and beneficial to the child and weighing the other factors present in the record." ***K.T.***, 296 A.3d at 1114-15. That Mother loves Children and was "dedicate[ed] to maintaining her parental relationship with her children," ***see*** Statement, 9/6/2023, at 3, is insufficient because children have myriad needs beyond love. ***See Z.P.***, 994 A.2d at 1121.

The main defect in the orphans' court's analysis is its examination of the needs and welfare determination from Mother's perspective as opposed to solely from Children's point of view. The orphans' court reliance on Mother's "connection" to Children failed to even consider whether the same was true from Children's perspective. A parent-child bond is more than a shared biological connection or a parent's or child's affection towards the other; instead, it is a "bilateral relationship." ***In re K.K.R.-S***, 958 A.2d 529, 535 (Pa. Super. 2008). The court emphasized Mother's love towards Children but, despite ample evidence in the record, made no mention of Children's feelings

towards Mother or the effect that Mother's behavior and struggles have had upon Children.

For example, while finding that Mother has consistently visited with Children, the orphans' court failed to note that for the past year, such visits occurred electronically over Zoom. Orphans' Court Opinion, 8/4/2023, at 4-5 (F.F. ¶¶ 38, 42). The counselor at the jail described the initial Zoom visits as "very rocky" but improving. N.T., 5/11-12/2023, at 190. The visits occur every other week for fifteen minutes while Children are eating breakfast and getting ready for school. *Id.* at 190-93, 197, 200-01. Even Mother recognized that her ability to connect with Children from jail was strained because she does not "know what [is] going on in their daily active li[ves]" except when Children's foster mother participated in the call to provide information about their daily lives and interests. *Id.* at 214, 231-32.

The orphans' court's reference to the "connection" between Mother and Children is the term used by the CYS caseworker when describing their relationship. N.T., 5/11-12/2023, at 147. Crucially, the orphans' court failed to mention the caveat that Children's connection with Mother is not always healthy. *Id.* at 147, 162. The caseworker explained that Mother does not take Children's feelings into consideration and allows her own feelings to predominate, which causes G.W., in particular, to shut down. *See id.* at 162-63. The orphans' court was not required to find the caseworker's testimony credible or convincing, but its failure to consider the entirety of her testimony on this important subject or to analyze whether Children have a "necessary

and beneficial" bond with Mother was legally erroneous. ***K.T.***, 296 A.3d at 1115.

The orphans' court further determined that Children have "a bond with foster mother/father, in that [Children have] been placed in their home since May 17, 2021, and [Children] identify … the foster mom/dad as [their] family." Orphans' Court Opinion, 8/4/2023, at 4 (F.F. ¶ 41). This finding has ample record support, as the evidence indicates that Children are very bonded to each other and to their foster parents. N.T., 5/11-12/2023, at 180. While Children know that Mother is their parent, they look to their foster parents for "the typical parent connection" of guidance, safety, and structure. ***Id.*** at 178. The orphans' court neglected entirely to discuss Children's need for security, safety, and structure in its analysis. Furthermore, while it is true that time in care does not preordain the outcome (as the orphans' court blithely noted), it is a factor that the orphans' court must consider, which it expressly did not do. ***See K.T.***, 263 A.3d at 1110-11.

Curiously, the court made the following additional "finding of fact":

Considering the connection between [Children] and Mother, there was no testimony offered whatsoever to show that this connection can be severed without irreparable harm to [Children]; nor was it proven that the trauma caused by breaking the connection is outweighed by the benefit of moving the child toward a permanent home.

Orphans' Court Opinion, 8/4/2023, at 5 (F.F. ¶ 43). To say that CYS produced "no testimony whatsoever to show that this connection can be severed without

irreparable harm to Children," without discussing the evidence CYS did produce, is both incorrect as a matter of law and inconsistent with the record.

While the petitioner presents the evidence and bears the burden of proof to satisfy the needs and welfare prong of subsection (a)(8), it is up to the **court** to "evaluate whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare" and the "impact of severance to determine if it will pose more than an adverse or detrimental impact." *See K.T.*, 296 A.3d at 1110-11. Based upon the orphans' court's truncated analysis, it appears it was looking for a CYS witness to recite "magic words" instead of conducting its own evaluation of the evidence before it. *Accord id.* at 1114. Orphans' courts are free to find the petitioner's evidence unconvincing or incredible, or to weigh a child's necessary and beneficial bond with a biological parent more heavily than the other factors announced in *K.T.* But the court's failure, as here, to discuss the evidence CYS produced and to analyze it within the needs and welfare framework is legal error. Instead, as in *K.T.*, the orphans' court in the case at bar gave no indication that it weighed the "considerations of foster parent bond, preadoptive home, and need for permanency" in its analysis "despite the fact the record included relevant evidence." *Id.*

In addition to the caseworker's testimony regarding the health of their connection to Mother, evidence was admitted that showed Children's reactions towards Mother. The record reflects that G.W., the oldest child, "disconnects"

around Mother. *Id.* at 88-89, 147. G.W. does not want to participate in some of the visits, shuts down around Mother, and sometimes will not acknowledge her when she speaks to him. *Id.* at 162-63, 172-73. Normally, he is a "wild, loud, crazy kiddo" who enjoys engaging in activities in the foster home, but around Mother, G.W. is "somber." *Id.* at 147. The caseworker testified that G.W. has never expressed a desire to be with Mother. *Id.* at 168.

Additionally, the record reflects that G.W. is in need of trauma therapy. *Id.* He is starting to disclose trauma from his past, but he typically shuts down and will not discuss specifics. *Id.* He has told the caseworker, however, that he is "always afraid" because someone touched him inappropriately in the past (prior to his placement in the foster home). *Id.* at 173.

T.W., the younger child, who has spent half her life with Mother and half her life with her foster parents, seems more torn between them. *Id.* at 169. T.W., however, has demonstrated fear when Mother has outbursts, such as when Mother was "very upset" about T.W.'s finger being pinched in the door by G.W. and ran into the courtroom holding T.W.'s finger and accusing the foster parents of abuse. *Id.* at 169, 172.

Given Children's young ages, Children's time out of Mother's care, the maintenance of the relationship only by supervised visits and fifteen-minute Zoom calls, Children's relationship with their foster parents, their need for permanency and stability, and the effect of Mother's behaviors upon Children, the record in this case facially supports a conclusion that terminating Mother's

parental rights best serves Children's needs and welfare under a comprehensive needs and welfare analysis. Nevertheless, our standard of review does not permit us to make factual findings from the cold record without the benefit of the orphans' court's longitudinal knowledge and firsthand credibility determinations. *See I.J.*, 972 A.2d at 13.

Thus, we remand the case to the orphans' court for it to promptly conduct a comprehensive needs and welfare analysis under the proper legal standard. *Id.* As the Supreme Court did in *K.T.*, "considering termination's irreversible effect on a child's relationship with a parent, we allow the trial court an opportunity to review the record or further develop it with the foregoing clarification of the 2511(b) analysis in hand." *See K.T.*, 296 A.3d at 1117.

**Certified Record**

Our final consideration is whether the certified record on appeal is adequate for this Court to conduct appellate review of whether CYS proved, by clear and convincing evidence, that Mother's parental rights should be terminated. As an appellate court, our role is not to decide whether CYS satisfied its burden of proof at the hearing; instead, we must decide whether the orphans' court abused its discretion or erred as a matter of law in deciding that CYS did not. *See S.K.L.R.*, 256 A.3d at 1129; *C.M.*, 255 A.3d at 358. We must determine whether there is record support for the orphans' court's factual findings. *See id.* But we are not the finders of fact, and we cannot

- 40 -

substitute our judgment for that of the orphans' court. *See S.K.L.R.*, 256 A.3d at 1123-24.

As our analysis above reflects, the evidence and information contained in the certified record on appeal supports the orphans' court's factual findings. Specifically, CYS presented evidence that Mother's longstanding and ongoing struggles with substance use and the criminal justice system, which have had, and continue to have, an adverse impact upon her ability to parent Children, persisted at the time CYS filed the petitions to terminate Mother's parental rights (fourteen months after Children's removal) and at the time of the hearing on the petition (twenty-four months after removal).

That the certified record was adequate for us to review the orphans' court's findings for evidentiary support, however, does not mean that we condone the method by which CYS presented its case before the orphans' court or before this Court on appeal. We are fully cognizant that child welfare agencies often have burdensome caseloads and fewer resources than would be ideal to do the required job. Nonetheless, because certain aspects of CYS's inartful case presentation complicated our review, we are compelled to identify our concerns in the hopes that agencies across the Commonwealth will take heed.

Most significantly, the record reflects that at the hearing, CYS spent an inordinate amount of time presenting facts that did not even warrant a mention in the orphans' court's findings, yet in areas of great importance, it

produced precious little information. For example, it introduced certain evidence concerning Mother's mental health—including her 2018 diagnosis of schizophrenia and refusal to comply with medication management—through a caseworker's secondhand testimony instead of calling external service providers to testify or seeking to enter the reports into evidence, taking the gamble that Mother's counsel would not object to the multiple layers of hearsay.[21]

Additionally, though CYS obtained the orphans' court's permission to incorporate the dependency court orders and petitions into the record, *see* N.T., 5/11-12/2023, at 180-82, save for the adjudication order that it introduced as a separate exhibit, CYS did not ensure that the incorporated

---

[21] The Rules of Evidence apply to termination of parental rights proceedings. ***See*** Pa.R.E. 101(a) (indicating that the "rules of evidence govern proceedings in all courts of the Commonwealth of Pennsylvania's Unified Judicial System, except as otherwise provided by law"); ***see also, e.g., In re A.J.R.-H.***, 188 A.3d 1157, 1171 (Pa. 2018) (vacating decree terminating parental rights because decree was based upon en masse introduction of 167 exhibits with multiple layers of hearsay over parent's hearsay objection). To preserve a claim of error pertaining to the admission of evidence, the party must, on the record, make a timely objection, motion to strike, or motion in limine that states the specific ground, unless the ground was apparent from the context. Pa.R.E. 103(a). "Where evidence, incompetent as hearsay, is admitted without objection it may be given its natural probative effect as if it was in law admissible." ***Commonwealth v. Farquharson***, 354 A.2d 545, 552 (Pa. 1976). Although Mother did not object to the introduction of this evidence, we remind CYS that given the seriousness of the termination of parental rights, "it is important that a judicial decree extinguishing such rights be based solely on competent evidence." ***A.J.R.-H.***, 188 A.3d at 1171. As we noted earlier, our decision is not based upon the presence or absence of evidence concerning Mother's mental health.

orders and petitions were transmitted to this Court. As the appellant, this is ultimately CYS's responsibility. ***See In re R.N.F.***, 52 A.3d 361, 364 (Pa. Super. 2012); Pa.R.A.P. 1921, Note. ***See also Interest of S.S.***, 252 A.3d 681, 688 (Pa. Super. 2021) (noting that this Court does not automatically receive the juvenile court dependency record in an appeal from the orphans' court's termination decision; although termination proceedings are often interrelated to dependency proceedings, the proceedings remain "distinct, with their own docket numbers, records, and divisions within the Court of Common Pleas").

Termination of parental rights is not a technicality that occurs automatically after children are in foster care for a set number of months. No matter how much familiarity the parties, witnesses, and orphans' court have with the facts from the dependency matter, an agency-petitioner must always support its petition to terminate parental rights with a clear presentation of evidence that is derived from firsthand sources (to the extent possible) and that is tightly focused on the precise statutory elements at hand. We emphasize that while we were able to conduct our appellate review today, CYS (and all agency petitioners) should take care to ensure that it presents a robust, streamlined, and complete record for our review in the future.

### Conclusion

Based on the foregoing, we vacate the decrees denying CYS's petitions to terminate Mother's parental rights to Children and remand for the matter

to the orphans' court to conduct the requisite needs and welfare analysis within twenty-one days of this decision.

Decrees reversed. Case remanded with instructions. Jurisdiction relinquished.

Judge Dubow, Judge Kunselman, Judge Murray, and Judge Sullivan join this Opinion.

President Judge Emeritus Panella concurs in the result.

President Judge Lazarus files a Concurring Opinion, in which President Judge Emeritus Panella, Judge Stabile, Judge Kunselman, and Judge McLaughlin join.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 7/21/2025